# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ROBERT BOSCH LLC, | ) |
| Plaintiff, | ) C. A. No. 08-542-SLR |
| vs. | ) |
| PYLON MANUFACTURING CORP., | ) **PUBLIC VERSION** |
| Defendant. | ) |

**PLAINTIFF ROBERT BOSCH LLC'S OPENING BRIEF IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT OF NO INEQUITABLE
CONDUCT AND NO INVALIDITY FOR DERIVATION WITH
RESPECT TO U.S. PATENTS 6,292,974, 6,944,905 AND 6,675,434**

OF COUNSEL:

Michael J. Lennon
Mark A. Hannemann
Jeffrey S. Ginsberg
KENYON & KENYON LLP
One Broadway
New York, NY 10004
Tel: (212) 425-7200

Dated: November 12, 2009
Public Version Dated: November 19, 2009
943263 / 33181

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19801
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Plaintiff Robert Bosch LLC*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

NATURE AND STAGE OF THE PROCEEDINGS ................................................... 2

SUMMARY OF THE ARGUMENT .......................................................................... 2

STATEMENT OF MATERIAL FACTS .................................................................... 3

I.   THE TECHNOLOGY AT ISSUE ...................................................................... 3

　　　B.   The '974 Patent ........................................................................................ 5

　　　C.   The '905 Patent ........................................................................................ 6

　　　D.   The '434 Patent ........................................................................................ 6

II.   THE ROBERT BOSCH GMBH-AMIC MEETINGS ........................................ 7

III.   AMIC'S PRIOR ALLEGATIONS .................................................................. 11

SUMMARY OF APPLICABLE LAW ..................................................................... 14

I.   SUMMARY JUDGMENT STANDARD ......................................................... 14

II.   CORROBORATION IS REQUIRED WHEN A PATENT IS CLAIMED
　　 TO HAVE IMPROPER INVENTORSHIP ....................................................... 15

III.   A CLAIM OF INEQUITABLE CONDUCT REQUIRES A SHOWING OF
　　　A MATERIAL OMISSION OR MISREPRESENTATION AND A SPECIFIC
　　　INTENT TO DECEIVE THE PATENT OFFICE .......................................... 16

IV.   FAILURE TO PROVIDE PROPER NOTICE OF AN AFFIRMATIVE DEFENSE
　　　RESULTS IN WAIVER OF THAT DEFENSE .............................................. 17

ARGUMENT ............................................................................................................... 18

I.   PYLON'S CONCLUSORY ASSERTIONS THAT THE '974, '434 AND
　　'905 PATENTS ARE INVALID PURSUANT TO 35 U.S.C. §102(f) ARE
　　INSUFFICIENT TO CREATE A GENUINE ISSUE OF MATERIAL FACT .................. 18

II.   NO REASONABLE JURY COULD FIND IMPROPER INVENTORSHIP IN
　　 CONNECTION WITH THE BOSCH PATENTS .......................................... 19

　　　A.   Fehrsen's Notes Do Not Show that He, Not Bosch, Conceived of the Claimed
　　　　　Inventions of the '974 and '905 patents .............................................. 19

1.  Mr. Fehrsen's notes do not indicate who proffered the idea of using the claimed spoiler .................................................................................... 19

2.  Ferhsen's notes do not  support a disclosure that would enable a person of ordinary skill to practice the inventions occurred.................... 19

B.  Mr. Lewis's Letter Does Not Corroborate Mr. Fehrsen's Testimony ................. 20

C.  Mr. Olivier's Testimony Does Not Provide Corroboration ................................. 20

D.  Pylon Cannot Show Prior Conception of the Inventions of the '434 Patent by  Fehrsen ....................................................................................................... 21

E.  Pylon Cannot Meet its Burden of Showing Prior Conception and Disclosure ..... 21

III.  PYLON CANNOT MEET ITS BURDEN TO PROVE INEQUITABLE CONDUCT....... 22

A.  Pylon Has Offered No Evidence That Demonstrates That the Inventors of the '905 and '434 Patents Knew of Any Alleged Contribution by Mr. Fehrsen ....................................................................................................... 22

B.  Pylon Cannot Show any Evidence of a Specific Intent to Deceive the Patent Office in Connection with the Prosecution of the '974, '905 or '434 Patents........................................................................................................... 24

CONCLUSION.................................................................................................................... 24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................ 14

*Bd. of Educ. v. Am. Bioscience, Inc.*,
  333 F.3d 1330, 1337 (Fed. Cir. 2003) ...................................................................... 15

*Burroughs Wellcome Co. v. Barr Lab.*,
  40 F.3d 1223 (Fed. Cir. 1994) ........................................................................ 15, 20

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................ 14

*CIENA Corp. v. Corvis Corp.*,
  334 F. Supp. 2d 610 (D. Del. 2004) ...................................................................... 17, 18

*Daiichi Pharm. Co., Ltd. v. Apotex, Inc.*,
  2005 U.S. Dist. LEXIS 26059 (D.N.J. Nov. 1, 2005) ...................................................... 18

*Digital Control Inc. v. Charles Machine Works*,
  437 F.3d 1309 (Fed. Cir. 2006) ........................................................................ 16

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
  575 F.3d 1312 (Fed. Cir. 2009). ...................................................................... 16, 23, 24

*Gambro Lundia AB v. Baxter Healthcare Corp.*,
  110 F.3d 1573 (Fed. Cir. 1997) ........................................................................ 15, 22

*Hay & Forage Indus. v. New Holland N. Am., Inc.*,
  60 F. Supp. 2d 1099 (D. Kan. 1998) ...................................................................... 16

*M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.*,
  439 F.3d 1335 (Fed. Cir. 2006) ........................................................................ 24

*Medtronic Vascular, Inc. v. Advanced Cardiovascular Sys.*,
  2005 WL 46553 (D. Del. Jan. 5, 2005) .................................................................... 15

*Oracle Corp. v. Parallel Networks, LLP*,
  588 F. Supp. 2d 549 (D. Del. 2008) ...................................................................... 17, 18

*Price v. Symsek*,
  988 F.2d 1187 (Fed. Cir. 1993) ........................................................................ 15, 19

*Robinson v. Johnson*,
  313 F.3d 128 (3d Cir. 2002) ............................................................................ 17, 18

*Rothman v. Target Corp.*,
  556 F.3d 1310 (Fed. Cir. 2009) ........................................................................ 24

iii

*Sandt Tech. Ltd v. Resco Metal & Plastics Corp.*,
    264 F.3d 1344 (Fed. Cir. 2001) ................................................................. 15

*Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*,
    528 F.3d 1365 (Fed. Cir. 2008) ....................................................... 17, 22, 23

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*,
    537 F.3d 1357 (Fed. Cir. 2008) ....................................................... 16, 23, 24

*Woodland Trust v. Flowertree Nursery, Inc.*,
    148 F.3d 1368 (Fed. Cir. 1998) ................................................ 15, 16, 19, 21

*Zelinski v. Brunswick Corp.*,
    185 F.3d 1311 (Fed. Cir. 1999) ............................................................ 17, 18

**Statutes**

35 U.S.C. § 102(f)............................................................................. passim

**Rules**

Fed. R. Civ. P. 56(c) ........................................................................... 2, 14

Fed. R. Civ. P. 8(c)(1)............................................................................ 17

# INTRODUCTION

Pylon Manufacturing Corp. ("Pylon") has alleged that U.S. Patents 6,292,974 ("the '974 patent"), 6,944,905 ("the '905 patent") and 6,675,434 ("the '434 patent") (collectively, "the Bosch Patents") are unenforceable because of inequitable conduct for failing to name the proper inventors and invalid for derivation under 35 U.S.C. 102(f). (D.I. 56 at ¶¶ 22-52).

Pylon's allegations are based on a 1992 meeting between representatives of Robert Bosch GmbH, the non-party parent of plaintiff Robert Bosch LLC, and Anglo American Industrial Corporation ("AMIC") concerning wiper blade design. The only documentation that Pylon has produced in alleged support of its claims are certain handwritten notes of Johannes Fehrsen, who Pylon alleges is the actual inventor of the Bosch Patents. However, those notes do not identify who proposed the subject matter at issue. In fact, it was the Bosch inventors, not Mr. Fehrsen, who proposed the pertinent information regarding wiper blade design, which is why Bosch, not Fehrsen, filed for and obtained patents based on the same.

Federal Circuit precedent is clear that allegations of prior inventorship must be corroborated by testimony or documentary evidence sufficient to demonstrate that one of ordinary skill in the art could have made the invention. Mr. Fehrsen's handwritten notes fail to show that he conceived of the inventions in the Bosch Patents and do not possess such detail that one of ordinary skill in the art could have made the invention using them. While Mr. Fehrsen testified that he did have several meetings with one of the inventors of the '974 patent, Mr. Fehrsen's testimony does not support his claim that he conceived of any of the inventions claimed in the '974 patent. With respect to the '434 and '905 patents, there is a complete absence of documentary evidence or testimony that shows any link between Mr. Fehrsen and the named inventors on these two patents.

Accordingly, Bosch respectfully requests that the Court find that the '974, '905 and '434 patents are not unenforceable for inequitable conduct and are not invalid for derivation under 35 U.S.C. § 102(f).

## NATURE AND STAGE OF THE PROCEEDINGS

Robert Bosch LLC ("Bosch") filed this patent infringement suit accusing Pylon of infringing, *inter alia*, the '974, '905 and '434 patents. Fact and expert discovery have now closed.

The Court has scheduled a claim construction and summary judgment hearing on February 12, 2010, a pretrial conference on March 22, 2010 and a two week trial beginning on April 12, 2010.

## SUMMARY OF THE ARGUMENT

Bosch submits this brief in support of its motion, pursuant to Fed. R. Civ. P. 56(c ), for entry of summary judgment holding that the Bosch Patents at issue are not unenforceable for inequitable conduct and are not invalid under 35 U.S.C. § 102(f)

As an initial matter, Pylon has failed to both properly plead a defense of invalidity for derivation under 35 U.S.C. § 102(f) and give notice of its contentions through interrogatory responses.

Federal Circuit law makes clear that a claim of improper inventorship and any claim of inequitable conduct or derivation under 102(f) based thereon requires corroboration in the form of documentary or testimonial evidence. Pylon has not provided the required corroboration to Mr. Fehrsen's testimony, and therefore, its allegations must fail as a matter of law. Further, Pylon has not provided any facts sufficient to show any evidence (let alone clear and convincing

2

evidence) of a specific intent to deceive the Patent Office and, therefore, its allegations of inequitable conduct must also fail.

## STATEMENT OF MATERIAL FACTS

### I.      THE TECHNOLOGY AT ISSUE

Bosch, by way of assignment from its non-party parent Robert Bosch GmbH, is the owner of the '974, '905 and '434 patents (Ex. 33 and 34 (BOS-SJA530, 531)),[1] each of which is directed to improvements over conventional, bracketed wiper blades (*see generally*, Ex. 1, '974 patent (JA1–8), Ex. 3, '434 patent (JA294–305), and Ex. 5, '905 patent (JA547–559)).

Conventional wiper blades utilize a support superstructure, composed of yokes, to distribute the pressure applied by the wiper arm to the wiping element. (Ex. 2, Merkel Dep. at 9:18-10:25 (BOS-SJA14-15)).[2] As illustrated in the figure below, conventional wiper blades typically have multiple levels of brackets resulting in numerous pressure points along the wiping element. (*See* Ex. 3, Buechele Dep. at 21:15–22:18 (BOS-SJA23-24)).

---

[1] Citations to "Ex." refer to exhibits to either (1) the exhibits in the *Joint Appendix of Exhibits to the Parties' Opening Claim Construction Briefs*, or (2) the exhibits attached to the *Appendix in Support of Plaintiff Robert Bosch LLC's Motions for Summary Judgment of Infringement of the '974 Patent, No Inequitable Conduct and No Invalidity for Derivation with respect to the '974, '905 and '434 Patents, and Non-infringement of the '380 Patent,* which was filed concurrently with this brief. Citations to the Joint Appendix are denoted by the pin-cites "JA___," while citations to Bosch's Summary Judgment Appendix are denoted by the pin-cites "BOS-SJA___."

[2]      As discussed below, Mr. Wilfred Merkel is a named inventor of the '974 patent.

Conventional Wiper Blade



During his deposition, Pylon's technical expert and consultant, Mr. Franz Buechele, acknowledged that the design of conventional wiper blades presents a number of disadvantages. For example, the superstructure fails to evenly distribute the pressure applied by the wiper arm along the entire length of the wiping strip. (Ex. 3, Buechele Dep. at 23:11–25 (BOS-SJA24)). The pressure points result in an uneven wipe, or streaking—a problem that is particularly pronounced in vehicles with a curved windshield. (*Id.* at 24:2-14 (BOS-SJA24)). Further, the superstructure of conventional wiper blades tends to become clogged by debris, ice and snow, which can increase the rigidity of the blade and thus further impair its performance. (*Id.* at 24: 15-22 (BOS-SJA24)).

Beam (bracketless) wiper blades substitute the support superstructure of the conventional wiper blade with a spring elastic support element. (*See* Ex. 2, Merkel Dep. at 9:12-17 (BOS-SJA14)). The spring-elastic support element assures an even wipe by distributing the pressure load applied by the wiper arm along the entire wiper strip, which hugs the windshield as its curvature changes. (*See* Ex. 1 at 1:7–23 (JA4)). Beam blades have the additional advantages of a lower profile and lower noise levels during operation. (*See* Ex. 2, Merkel Dep. at 17:25-18:7 (BOS-SJA16-17)).

4

Beam Wiper Blade



However, several problems had previously prevented the successful implementation of the beam blade concept. One such problem is the tendency of the beam blade, especially its outer edges, to lift off from the windshield at high speeds. (*See* Ex. 1 at 1:24–46 (JA4)).

The Bosch Patents are directed to innovations that have led to the successful use of beam blades in the market. Since the Bosch beam blades were introduced, they have received significant industry acclaim. Among the awards bestowed on Bosch's beam blades are the Frost and Sullivan Award for Product Innovation, the Motortec award, the Automechanika award and the Automotive News PACE award. (*See* Ex. 5 (BOS-SJA47-56)).

██████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

**B.     The '974 Patent**

The '974 patent teaches a beam blade that prevents lift at high speeds by deflecting wind up and over the blade—through the use of a flexible spoiler on top of the support element—thereby creating additional down force along the length of the wiper blade at higher speeds. (*See* Ex. 1 at 1:58–2:3, 2:11–15 (JA4)).

███████████████████████████

███████████████████████████

███████████████████████████

The '974 patent issued on September 25, 2001 and claims priority to a German application filed on August 21, 1997.  (*See* Ex. 1 (JA1)).

C.    **The '905 Patent**

The '905 patent issued on September 20, 2005, listing Peter De Block and Peter Wijnants as the inventors.  (*See* Ex. 5 (JA547)).  The '905 patent claims priority to a German application filed on May 29, 2000.  (*Id.*)  The '905 patent is not a continuation of, or otherwise part of, the '974 patent family.

The '905 patent further refines the improvements in the '974 patent by defining the structure of the spoiler.  Specifically, the spoiler as described in the '905 patent includes two diverging legs, with an attack surface embodied on the outside of one leg, allowing for a reduction in both weight and material costs.  (*See* Ex. 5 at 1:55–64) (JA553)).  The use of diverging legs also results in a reduction of the spoiler's rigidity, further reducing any negative effects on the support element's flexibility.  (*Id.* at 1:61–64 (JA553)).

D.    **The '434 Patent**

The '434 patent, which issued on January 13, 2004, lists Manfred Wilhelm, Thomas Kotlarski and Julius Mazurkiewicz as inventors.  (*See* Ex. 3 (JA295)).  The '434 patent issued from a PCT application filed on June 30, 1999.  (*Id.*)

The named inventors of the '434 patent recognized that the end caps can adversely impact the elasticity of spring elastic support element.  (*See, e.g.*, Ex. 3 at 1:46–55 (JA300)).  The '434 patent describes end caps that are used to maintain the integrity of the wiper blade without adversely affecting the elasticity of the beam.  (*Id.*)

6

## II.      THE ROBERT BOSCH GMBH-AMIC MEETINGS

In the late 1980s, a South African engineer, Adriaan Swanepoel, conceived of a type of bracketless wiper blade, which he named "Variflex." (Ex. 35, Swanepoel Dep. at 17:15-19:18 (BOS-SJA533-34)). Unlike earlier wiper blades, the Variflex blade tapered, in at least one dimension, away from the central connection device. (*Id.* at 90:1-18 (BOS-SJA544)).

In 1990, Mr. Swanepoel entered into discussions with AMIC representatives Johannes Fehrsen and Laurence Olivier to develop and commercialize the Variflex blade. Mr. Fehrsen was put in charge of the Variflex project, AMIC's attempt to commercialize and market the Variflex blade. (Ex. 36, Fehrsen Dep. at 22:13-21 (BOS-SJA548)). Laurence Olivier was an AMIC executive who oversaw the business side of new technology developments. (Ex. 37, Olivier Dep. at 15:23-16:4 (BOS-SJA565); Ex. 36, Fehrsen Dep. at 31:5-10 (BOS-SJA549)). Messrs. Olivier and Fehrsen had a close working relationship in the early 1990s and have remained occasionally in touch since then. (Ex. 37, Olivier Dep. at 19:12-18; 95:14-96:9 (BOS-SJA566, 570)).

Later in 1990, AMIC contacted Robert Bosch GmbH to present the Variflex technology in connection with a joint development proposal. (Ex. 35, Swanepoel Dep. at 25:19-28:3 (BOS-SJA535-36); Ex. 36, Fehrsen Dep. at 16:24-17:3 (BOS-SJA546)). During the course of initial discussions, AMIC provided sample blades to Robert Bosch GmbH. (Ex. 35, Swanepoel Dep. at 27:8-18, 32:4–17 (BOS-SJA536, 537)). However, none of these sample blades had either a spoiler or end caps. (Ex. 35, Swanepoel Dep. at 29:7–14; 31:18–32:17 (BOS-SJA536, 537)).

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████

7

In September of 1992, Robert Bosch GmbH and AMIC held a series of meetings at Robert Bosch GmbH's facilities in Germany and Belgium. (Ex. 36, Fehrsen Dep. at 38:10–40:4 (BOS-SJA550); Ex. 2, Merkel Dep. at 14:24–16:8 (BOS-SJA16)). Among the participants at these meetings were Messrs. Leutsch and Merkel from Robert Bosch GmbH (two of the named inventors on the '974 patent), and Messrs. Fehrsen and Olivier from AMIC. (*See* Ex. 36, Fehrsen Dep. at 40:21–41:3 (BOS-SJA550-51), Ex. 2, Merkel Dep. at 15:10–16:10 (BOS-SJA16)). None of the other named inventors of the '974, '434, or '905 patents was present at these meetings. (*See* Ex. 36, Fehrsen Dep. at 82:11–83:17, 91:6–10 (BOS-SJA554, 555); Ex. 38, Kotlarski Dep. at 6:20–22 (BOS-SJA573)).

At the September 17, 1992 meeting, Messrs. Leutsch and Merkel and Messrs. Fehrsen and Olivier discussed the Variflex blade's poor wiping quality and the blade's tendency to lift off of the window at high speeds. (*See* Ex. 36, Fehrsen Dep. at 40:14-43:3 (BOS-SJA550-51), Ex. 2, Merkel Dep. at 16:23–17:3 (BOS-SJA16)). ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████
██████████████████████████████████
████████████████████████████████████████







There were no further discussions between Bosch and AMIC regarding the use of a spoiler on top of a beam blade.

Nearly seventeen years later, in the present action, Mr. Fehrsen testified that he invented the inventions embodied in the Bosch Patents and disclosed the same to Robert Bosch GmbH at the September 17, 1992 meeting. (*See, e.g.,* Ex. 36, Fehrsen Dep. at 43:14-19 (BOS-SJA551)). However, Pylon has produced no corroborating testimony or documents that credibly support this bald assertion.

For example, prior to the September 1992 meetings, Messrs. Swanepoel, Fehrsen and Olivier met with a patent attorney in South Africa, Mr. Alan Lewis of the firm Adams & Adams. (*See* Ex. 41 (BOS-SJA582-84)). In a letter from March 1992, Mr. Lewis wrote that "It was . . .

10

decided that consideration would be given to filing further patent applications directed to the following aspects: . . . The use of a spoiler." (*Id.* at 2-3 (BOS-SJA583-84)).  However, the use of a spoiler is not further described or otherwise discussed in the Lewis letter, and the letter does not provide any information about the proposed structure of a spoiler, the materials from which such a component would be manufactured, or how it would attach to the wiper blade. Indeed, handwritten notes on the letter indicate that it was decided to "drop" this aspect from consideration for patent filing.  (*Id.* at 3 (BOS-SJA58441)).  Neither Mr. Fehrsen nor Mr. Swanepoel testified about any details of a proposed spoiler.

Likewise, Mr. Fehrsen's claim that he disclosed end caps for beam blades to Robert Bosch GmbH at the same September 17, 1992 meeting (*See* Ex. 36, Fehrsen Dep. at 50:9–51:1 (BOS-SJA553)) is completely unsubstantiated.  None of the documents produced by the parties in this action corroborates this claim and Mr. Fehrsen has admitted that no documentary record was made of this supposed disclosure.  (*See id.* at 156:9–23 (BOS-SJA559)).

Further, the record is completely devoid of any evidence that anyone other than the named inventors, Messrs. De Bock and Wijnants, invented the subject matter claimed in the '905 patent.

## III.    AMIC'S PRIOR ALLEGATIONS

In October 1996, Robert Bosch GmbH and AMIC terminated their business relationship. (*See* Ex. 36, Fehrsen Dep. at 157:7–12 (BOS-SJA560)).

Robert Bosch GmbH, however, continued to work on its own alternative beam blade designs, and eventually filed patent applications, including, among others, the applications that resulted in the '974, '905 and '434 patents.

11

In 1998, AMIC sold its intellectual property interest in the Variflex project to Trico. (*See generally* Ex. 42 (BOS-SJA585-640)). The agreement included a clause warranting that Robert Bosch GmbH had not made any use of the AMIC technology at issue. (*Id.* at ¶ 2.6 (BOS-SJA588)). The agreement further warranted that there were no joint developments arising from the cooperation with Robert Bosch GmbH. (*Id.* at ¶ 2.5 (BOS-SJA588)). Mr. Fehrsen was heavily involved on the part of AMIC in negotiating and drafting the agreement. (*See* Ex. 36, Fehrsen Dep. at 168:2-16 (BOS-SJA561)). Mr. Olivier signed the agreement on behalf of AMIC. (Ex. 42 at 27 (BOS-SJA612)).

Thereafter, Messrs. Fehrsen and Swanepoel started working for Trico—a Bosch competitor—and ceased working for AMIC. (Fehrsen Depo. Tr. at 117:19–121:3 (BOS-SJA557-58); Ex. 35, Swanepoel Dep. at 72:16–74:18 (BOS-SJA541-42)).

Mr. Swanepoel is still a consultant to Trico. (Ex. 35, Swanepoel Dep. at 73:14–20 (BOS-SJA541)).

In 2001, Trico allegedly became aware of German patent applications related to the '434 and '974 patents at issue. ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████

On July, 12, 2001, Trico sent a letter to AMIC expressing its alleged concerns regarding the inventions claimed in the German counterparts to the '974 and '434 patents. (Ex. 44 (BOS-SJA643-68)). No allegations were raised concerning the '905 patent or any patents or applications related thereto. Included in that letter was a declaration by Mr. Fehrsen stating that he and Mr. Swanepoel were the sole inventors of, among other things, the end cap and spoiler

disclosed in the German counterparts to the '434 and '974 patents, respectively. (Ex. 45 at ¶¶ 17-18 (BOS-SJA671)). Mr. Fehrsen further averred that he had disclosed these inventions to Robert Bosch GmbH during the September 17, 1992 meeting. (*Id.* at ¶¶ 6, 18 (BOS-SJA669-70, 671)). Mr. Fehrsen also stated, with no supporting documentation, that "items such as the end clip . . . were the result of joint development [between AMIC and Bosch GmbH] and arose out of our various technical discussions." (*Id.* at ¶ 11 (BOS-SJA670)). This statement is in direct conflict with the warranties expressed in the Trico/AMIC purchase agreement. (*See* Ex. 36, Fehrsen Dep. at 172:7-173:7 (BOS-SJA562-63)).





Finally, with regard to the '905 patent, although the German counterpart application published on December 6, 2001, neither AMIC nor Trico ever raised any allegations with regard to the inventions claimed in the '905 patent.

**SUMMARY OF APPLICABLE LAW**

**I.     SUMMARY JUDGMENT STANDARD**

Generally, summary judgment serves to "isolate and dispose of factually unsupported claims. . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) ; *see also* Fed. R. Civ. P. 56(c) .

## II.    CORROBORATION IS REQUIRED WHEN A PATENT IS CLAIMED TO HAVE IMPROPER INVENTORSHIP

"Upon the issuance of a patent, it is presumed that there are no inventors other than those listed on the patent." *Medtronic Vascular, Inc. v. Advanced Cardiovascular Sys.*, 2005 WL 46553, at *5 (D. Del. Jan. 5, 2005) (citing *Bd. of Educ. v. American Bioscience, Inc.*, 333 F.3d 1330, 1337 (Fed. Cir. 2003 )).  To overcome this presumption by way of a defense of derivation under 102(f) requires proof, by clear and convincing evidence, of "prior conception of the invention by another and communication of that conception to the patentee." *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1576 (Fed. Cir. 1997).  "[W]ithout some type of corroborating evidence, an alleged inventor's testimony cannot satisfy the 'clear and convincing evidence' standard." *Price v. Symsek*, 988 F.2d 1187, 1194 (Fed. Cir. 1993).  "Conception is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation.  Because it is a mental act, courts require corroborating evidence of a contemporaneous disclosure that would enable one skilled in the art to make the invention." *Burroughs Wellcome Co. v. Barr Lab.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994) (citations omitted). The best corroborating evidence is documentary evidence from the time of the supposed conception; post-invention oral testimony is suspect, "as there is more of a risk that the witness may have a litigation-inspired motive to corroborate the inventor's testimony, and that the testimony may be inaccurate." *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350-51 (Fed. Cir. 2001) . *See also  Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed. Cir. 1998) (noting that "there is a very heavy burden to be met by one challenging validity when the only evidence is the oral testimony of interested persons and their friends, particularly as to long-past events.").

15

Whether testimony has been corroborated is determined under a "rule of reason" standard considering all the evidence. *Woodland Tru st*, 148 F.3d at 1371. The Federal Circuit in *Woodland Trust* laid out eight factors to be considered in evaluating the supposedly corroborating evidence:

> (1) the relationship between the corroborating witness and the alleged prior user, (2) the time period between the event and trial, (3) the interest of the corroborating witness in the subject matter in suit, (4) contradiction or impeachment of the witness' testimony, (5) the extent and details of the corroborating testimony, (6) the witness' familiarity with the subject matter of the patented invention and the prior use, (7) probability that a prior use could occur considering the state of the art at the time, (8) impact of the invention on the industry, and the commercial value of its practice.

*Id.* These factors apply in a 102(f) analysis as well. *E.g.*, *Hay & Forage Indus. v. New Holland N. Am., Inc.*, 60 F. Supp. 2d 1099, 1128-31 (D. Kan. 1998).

## III.   A CLAIM OF INEQUITABLE CONDUCT REQUIRES A SHOWING OF A MATERIAL OMISSION OR MISREPRESENTATION AND A SPECIFIC INTENT TO DECEIVE THE PATENT OFFICE

A claim of unenforceability because of inequitable conduct requires a showing, by clear and convincing evidence, that "an applicant, with intent to mislead or deceive the examiner, fails to disclose material information or submits materially false information to the PTO during prosecution." *Digital Control Inc. v. Charles Machine Works*, 437 F.3d 1309, 1313 (Fed. Cir. 2006). The Federal Circuit has recently reaffirmed the longstanding rule that the individual making the misrepresentation must have had a specific intent to deceive the Patent Office. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 (Fed. Cir. 2009). A finding of the specific intent to deceive the Patent Office must be based on evidence that is "clear and convincing, and inferences drawn from lesser evidence cannot satisfy the deceptive intent requirement." *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008). An inference of intent to deceive "must also be the single most reasonable inference able

16

to be drawn from the evidence to meet the clear and convincing standard." *Id.* "Whenever evidence proffered to show either materiality or intent is susceptible of multiple reasonable inferences, a district court clearly errs in overlooking one inference in favor of another equally reasonable inference." *Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*, 528 F.3d 1365, 1376 (Fed. Cir. 2008).

## IV. FAILURE TO PROVIDE PROPER NOTICE OF AN AFFIRMATIVE DEFENSE RESULTS IN WAIVER OF THAT DEFENSE

Failure to plead an affirmative defense, results in a waiver of that defense. Fed. R. Civ. P. 8(c)(1) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense . . . ."). In the Third Circuit, an affirmative defense must be either pled in the answer or "raised at the earliest practical moment thereafter." *Robinson v. Johnson*, 313 F.3d 128, 137 (3d Cir. 2002 ). "The purpose of requiring the defendant to plead available affirmative defenses in his answer is to avoid surprise and undue prejudice by providing the plaintiff with notice and the opportunity to demonstrate why the affirmative defense should not succeed*.*" *Id.* at 134-35. "As a general rule, the Court has the discretion to find that a defendant waived a defense if it is not asserted timely, or if the Court otherwise finds that a defendant failed to exercise due diligence or has asserted the defense for dilatory purposes." *CIENA Corp. v. Corvis Corp.*, 334 F. Supp. 2d 610, 613 (D. Del. 2004).

Conclusory statements asserting invalidity in an interrogatory response are insufficient to raise an issue of material fact in connection with such defense. *Oracle Corp. v. Parallel Networks, LLP*, 588 F.Supp. 2d 549, 558-59 n.7 (D. Del. 2008) (citing *Zelinski v. Brunswick Corp.*, 185 F.3d 1311 (Fed. Cir. 1999)).

17

**ARGUMENT**

**I. PYLON'S CONCLUSORY ASSERTIONS THAT THE '974, '434 AND '905 PATENTS ARE INVALID PURSUANT TO 35 U.S.C. §102(f) ARE INSUFFICIENT TO CREATE A GENUINE ISSUE OF MATERIAL FACT**

Pylon never pled that the '974, '434 or '905 patents were invalid for derivation under 35 U.S.C. § 102(f).  While Pylon has alleged that these patents are invalid for failing to name the proper inventors in response to a Bosch interrogatory (*see* Ex. 31 (BOS-SJA463-81)), Pylon has failed to provide proper notice to support such defense.  In particular, Pylon has not provided any detail on which claims of each of the Bosch patents it believes are invalid, nor has it provided an element by element analysis or claim chart applying 102(f) to the elements of each of the claims of the Bosch patents.  Instead, Pylon has merely pointed to its inequitable conduct allegations and concluded that such actions render the Bosch Patents invalid under 35 U.S.C. § 102(f).  Such conclusory assertions are insufficient to raise an issue of material fact in connection with such defense. *Oracle Corp* , 588 F.Supp. 2d at 558-59 n.7 (citing *Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1317 (Fed. Cir. 1999) ).

Clearly, Pylon's bare assertions do not show that Pylon has exercised its due diligence in asserting its defense. *Ciena Corp.*, 33 4 F. Supp. 2d at 613.  Because of the lack of specific detailing of Pylon's contentions, Bosch has been prejudiced and has been denied an opportunity to address the defense. *Robinson* , at 134-35. *See also Daiichi Pharm. Co., Ltd. v. Apotex, Inc.*, 2005 U.S. Dist. LEXIS 26059, at *10 (D.N.J. Nov. 1; 2005)  (precluding a defendant from arguing a 102(f) defense when defendant failed to provide "specific justifications for its belief that" patent was invalid "based on section 102(f)" in either contention interrogatory responses or answer).  Accordingly, Bosch respectfully submits that it is entitled to summary judgment of no invalidity based on 102(f) .

## II.   NO REASONABLE JURY COULD FIND IMPROPER INVENTORSHIP IN CONNECTION WITH THE BOSCH PATENTS

To the extent that Pylon is permitted to assert that the '974, '434 and '905 patents are invalid for derivation under 35 U.S.C. § 102(f) , Pylon has provided no reliable corroborating evidence to support such a defense. Pylon relies on Mr. Fehrsen's testimony to show that he conceived of the inventions of the Bosch Patents independent of Bosch. However, Mr. Fehrsen's testimony alone is insufficient and must be corroborated. *Price*, 988 F.2d at 1194. None of the other documents or testimony disclosed in this case provides sufficient corroboration to overcome the presumption of validity. *Woodland Trust* , 148 F.3d at 1371.

### A.   Fehrsen's Notes Do Not Show that He, Not Bosch, Conceived of the Claimed Inventions of the '974 and '905 patents

#### 1.   Mr. Fehrsen's notes do not indicate who proffered the idea of using the claimed spoiler

Mr. Fehrsen testified that the September 17, 1992 meeting notes demonstrate that he conceived the idea of placing a spoiler on top of the beam on a beam blade. (*See* Ex. 36, Fehrsen Dep. at 45:25-46:7 (BOS-SJA552)). This is not so. The only portion of the notes relevant to the wind lift issue are two pictures. (*See* Ex. 40 at 4 (BOS-SJA581)). The pictures do not indicate who provided the information depicted. Such a document does not corroborate Mr. Fehrsen's supposed conception. ██████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████

#### 2.   Ferhsen's notes do not  support a disclosure that would enable a person of ordinary skill to practice the inventions occurred

Mr. Fehrsen's notes from the September 17 meeting do not corroborate his testimony that he conceived of and disclosed the inventions described in claimed in the '974 and '905 patents to

19

Robert Bosch GmbH.  To the extent Mr. Fehrsen has alleged that the illustration shows his conception of such inventions (Ex. 36, Fehrsen Dep. at 90:18-91:1 (BOS-SJA555)), the illustration provides no indication that Mr. Ferhsen (1) had so clearly defined the idea that one ordinary skill would be necessary to reduce the ideas to practice, and (2) that he communicated such ideas to Messrs. Merkel and Leutsch.  *Burroughs Wellcome*, 40 F.3d at 1228 ("Because it is a mental act, courts require corroborating evidence of a contemporaneous disclosure that would enable one skilled in the art to make the invention.").

With respect to the '905 patent, there is no testimony or documents that indicate that Mr. Fehrsen disclosed the diverging legs, end caps, or any other elements of the claims of the '905 patent, and there is nothing to suggest or corroborate a conception of the '905 patent by Fehrsen.

### B.   Mr. Lewis's Letter Does Not Corroborate Mr. Fehrsen's Testimony

The Lewis letter does not corroborate Mr. Fehrsen's testimony.  As noted above, the Lewis letter only mentions "use of a spoiler." (Ex. 41, at 2-3 (BOS-SJA583-84)).  The letter does not describe the structure of the spoiler or where it is mounted.  Without such details, the letter cannot provide clear and convincing evidence of conception of the inventions described in either the '974 or '905 patents.  *See Burroughs Wellcome*, 40 F.3d at 1228.  Clearly, such letter does not disclose the claimed subject matter of the '905 patent.

### C.   Mr. Olivier's Testimony Does Not Provide Corroboration

Pylon cannot rely on Mr. Olivier's testimony to corroborate Mr. Fehrsen's testimony. Mr. Olivier, despite being present at the September 17, 1992 meeting, was only able to testify that Mr. Fehrsen conceived of and disclosed the idea of a spoiler atop the beam after reading Mr. Fehrsen's notes.  (Ex. 37, Olivier Dep. at 62:23-63:14 (BOS-SJA568)).  He had no independent recollection before reviewing the notes.  (*Id.*)  On cross-examination, he was unable to recall the technical details discussed during the meeting.  (Ex. 37, Olivier Dep. at 92:8-94:9

(BOS-SJA569-70)).  Such incomplete testimony, of such a long ago event, cannot provide clear and convincing evidence of conception of the inventions described and claimed in the '974 and '905 patents.  *See Woodland Trust* , 148 F.3d at 1371.

### D.      Pylon Cannot Show Prior Conception of the Inventions of the '434 Patent by Fehrsen

Mr. Fehrsen's unsupported testimony that he invented and disclosed end caps to Bosch cannot support a claim of prior conception of the inventions of the '434 patent.  There is no testimony regarding when this supposed disclosure occurred.  Further, the invention claimed the '434 patent requires opposing detent shoulders to lock the end clips in place.  (Ex. 3 at claim 1 (BOS-SJA303)).  ███████████████████████████████████████████████████

███████████████████████████████████████████

### E.      Pylon Cannot Meet its Burden of Showing Prior Conception and Disclosure

As discussed above, there is no documentary evidence that supports Mr. Ferhsen's testimony that he conceived of and disclosed the inventions of the Bosch patents.  Mr. Olivier's testimony is insufficient to corroborate under the *Woodland Trust* factors.

Mr. Olivier and Mr. Fehrsen had a close relationship at the time of the events, and remain in touch now.  (Ex. 37, Olivier Dep. at 19:12-18; 95:14-96:9 (BOS-SJA566, 570)).  It has been more than 17 years since Mr. Fehrsen's supposed conception and disclosure of the inventions.  Messrs. Fehrsen's and Olivier's testimony is directly contradicted by the testimony of Messrs. Merkel and Leutsch.  Moreover, Mr. Fehrsen's own recollection of the events is cast into doubt by the discrepancies between his declaration and the warranties made in the Trico/AMIC purchase agreement regarding joint developments.  (Ex. 42 at ¶ 2.6 (BOS-SJA588)); (Ex. 45 at 1 (BOS-SJA669)).  Mr. Olivier was unable to recall the technical details of the September 17, 1992 meeting, and was able to only testify as to Mr. Fehrsen's supposed disclosure after being shown

the Fehrsen notes. (Ex. 37, Olivier Dep. at 62:23-63:14 (BOS-SJA568)). Indeed, Mr. Olivier

admitted that he was unfamiliar with the circumstances of the supposed prior conception and

with beam blade technology in general. (Ex. 37, Olivier Dep. at 94:1-9 (BOS-SJA570)).

Casting further doubt on Mr. Fehrsen's unsupported testimony regarding prior conception

is that Bosch was the first company to successful design, market and sell a beam blade. (*See* Ex.

52 (BOS-SJA708); Ex. 5 (BOS-SJA47–56)). Indeed, the success of Bosch's patented beam

blades, which have revolutionized the wiper blade industry, make it even less likely that a prior

conception would have been abandoned. (*See* Ex. 52 (BOS-SJA708)).

## III.    PYLON CANNOT MEET ITS BURDEN TO PROVE INEQUITABLE CONDUCT

As discussed above, Pylon cannot meet its burden to prove improper inventorship. The

true inventors are those named on the Bosch Patents. Since the true inventors were named, there

was no material omission or misrepresentation, no intent to deceive, and, hence, no inequitable

conduct. *See Gambro Lundia*, 110 F.3d at 1582; *Scanner Techs.*, 528 F.3d at 1375 ("In [the

inequitable conduct setting], the first question to address is whether the statements in question

are false. If not, materiality is lacking and there is no need to consider the intent prong of

inequitable conduct.").[3]

### A.    Pylon Has Offered No Evidence That Demonstrates That the Inventors of the '905 and '434 Patents Knew of Any Alleged Contribution by Mr. Fehrsen

Even if Pylon's unfounded allegations regarding Mr. Merkel and Mr. Leutsch were true,

two of the named inventors on the '974 patent, it is undisputed that the inventors of the '905

patent (Messrs. De Block and Wijnants) were not present at the September 17, 1992 meeting.

---

[3]    Bosch notes that Pylon, in an interrogatory response, accuses Bosch of inequitable
conduct during the prosecution of the '905 patent for "failing to disclose WO99/02383," an
alleged prior art reference. (Ex. 31 at 8-9 (BOS-SJA470-71)). However, Pylon cannot prevail on
this claim as it 1) was never pled, and 2) and Pylon provided no information to support such
baseless accusations. *Exergen*, 575 F.3d at 1328-31.

(*See* Ex. 36, Fehrsen Dep. 91:6–10 (BOS-SJA555)).  Indeed, Mr. Fehrsen had never heard of

either inventor before.  (*Id.*)  Likewise, the inventors of the '434 patent (Mr. Wilhelm, Mr.

Kotlarski and Mr. Mazurkiewicz) were also not present at such meeting.  (*See* Ex. 36, Fehrsen

Dep. at 82:11–83:17 (BOS-SJA554); Ex. 38, Kotlarski Dep. at 6:20–22 (BOS-SJA573))).

Pylon has failed to plead any facts that could give rise to an inference that the inventors

of either the '905 or '434 patents knew of any alleged invention by Mr. Fehrsen.  Pylon has

merely alleged that Mr. Fehrsen conceived of the invention and disclosed it to Robert Bosch

GmbH, while providing no factual basis to infer that any specific individual, who owed a duty of

disclosure in prosecuting the '905 and '434 patents, knew of the alleged contributions and made

an omission or misrepresentation of material fact to the Patent Office. *Exergen*,  575 F.3d at

1330.  This assertion, bereft of *any* factual support, fails to identify the "specific who, what,

when, where, and how of the material misrepresentation or omission committed before the

PTO," as required by Federal Circuit precedent.  *Id.* at 1328.  Pylon's failure falls far short of

giving rise to "the single most reasonable inference able to be drawn from the evidence." *Star*

*Sci.*, 537 F .3d at 1366.  *See also Scanner  Techs. Corp.*, 528 F.3d at 1376 ("Whenever evidence

proffered to show either materiality or intent is susceptible of multiple reasonable inferences, a

district court clearly errs in overlooking one inference in favor of another equally reasonable

inference.").

Given these facts and Pylon's failure to plead facts supporting its contentions, Pylon

cannot show by clear and convincing evidence, as it is required to do, that the inventors of the

'434 and '905 patents possessed "knowledge of the withheld material information or of the

falsity of the material misrepresentation." *Exergen*, 575  F.3d at 1327.  The inventors of the '905

and '434 patent "cannot be charged with culpable intent in withholding information that [they]

did not have." *Rothman v. Target Corp.*, 556 F.3d 1310, 1327 (Fed. Cir. 2009); *Exergen*, 575 F.3d at 1328-29.  This ground alone is enough to support summary judgment on the issue.

**B.      Pylon Cannot Show any Evidence of a Specific Intent to Deceive the Patent Office in Connection with the Prosecution of the '974, '905 or '434 Patents**

Pylon has had the opportunity to depose the inventors of the Bosch Patents. No evidence, much less clear and convincing evidence, has been elicited that would support any inference of specific intent to deceive the Patent Office, much less "the single most reasonable inference able to be drawn from the evidence." *Star Sci.*, 537 F.3d at 1366.  The lesser "evidence" proffered by Pylon, accusations and innuendo stemming from events 17 years gone, "cannot satisfy the deceptive intent requirement." *Id.* "There still must be a factual basis. . . for a finding of intent." *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.*, 439 F.3d 1335, 1341 (Fed. Cir. 2006) . Pylon has not, and cannot, show any factual basis for a finding of intent to mislead the patent office with respect to the '974, '905 or '434 patents

## CONCLUSION

For all of the foregoing reasons, Bosch respectfully requests that the Court grant summary judgment that the '974, '905 and '434 patents are not invalid under 102(f) and are not unenforceable for inequitable conduct.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Michael J. Lennon
Mark A. Hannemann
Jeffrey S. Ginsberg
KENYON & KENYON LLP
One Broadway
New York, NY 10004
Tel:  (212) 425-7200

Dated:  November 12, 2009
Public Version Dated: November 19, 2009
943263 / 33181

By:   /s/ David E. Moore
        Richard L. Horwitz (#2246)
        David E. Moore (#3983)
        Hercules Plaza, 6th Floor
        1313 N. Market Street
        Wilmington, Delaware  19801
        Tel:  (302) 984-6000
        rhorwitz@potteranderson.com
        dmoore@potteranderson.com

*Attorneys for Plaintiff Robert Bosch LLC*

25

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on November 19, 2009, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I hereby certify that on November 19, 2009, the attached document was Electronically Mailed to the following person(s):

Ashley B. Stitzer
Stephen B. Brauerman
Bayard, P.A.
222 Delaware Avenue, Suite 900
Wilmington, DE 19899
astitzer@bayardlaw.com
sbrauerman@bayardlaw.com

Gregory L. Hillyer
Javier Sobrado
Feldman Gale, P.A.
1420 Montgomery Lane, Suite 400
Bethesda, MD 20814
ghillyer@feldmangale.com
jsobrado@feldmangale.com

James A. Gale
Feldman Gale, P.A.
One Biscayne Tower, 30th Floor
2 S. Biscayne Blvd.
Miami, FL 33139
jgale@feldmangale.com

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
POTTER ANDERSON & CORROON LLP
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

890716 / 33181