## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ROBERT BOSCH LLC,　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　　 )
　　　　　　Plaintiff,　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　　 )　　C.A. No. 08-542-SLR
　　　　v.　　　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　　 )　　**JURY TRIAL DEMANDED**
PYLON MANUFACTURING CORP.,　　　　　 )
　　　　　　　　　　　　　　　　　　　 )
　　　　　　Defendant.　　　　　　　　　 )

## OPENING BRIEF IN SUPPORT OF ROBERT BOSCH
## LLC'S RENEWED MOTION FOR JUDGMENT AS A MATTER
## OF LAW OR IN THE ALTERNATIVE FOR A NEW TRIAL

OF COUNSEL:

Michael J. Lennon
Mark A. Hannemann
R. Scott Roe
Yekaterina T. Korostash
Jeffrey S. Ginsberg
Huiya Wu
KENYON & KENYON LLP
One Broadway
New York, NY 10004

Susan A. Smith
KENYON & KENYON LLP
1500 K Street, NW
Washington, DC 20005

Dated: May 26, 2010
968132 / 33181

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Plaintiff Robert Bosch LLC*

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

SUMMARY OF ARGUMENT .............................................................................................2

FACTS AND ARGUMENT ..................................................................................................3

    I.      Pylon's Evidence Of Derivation Was Insufficient To Overcome
          The Presumption Of Validity Of The '974 Patent.................................................3

          A.      Pylon Presented No Evidence of Derivation of Claim 8 of
                 The '974 Patent...........................................................................................6

          B.      Pylon Provided No Evidence Corroborating Mr. Fehrsen's
                 Alleged  Communication To Bosch of the Invention of Claim
                 1 of the '974 Patent....................................................................................7

          C.      Pylon Did Not Present Sufficient Corroboration of
                 Conception of Claim 1.................................................................................9

          D.      The Jury's Derivation Finding Is Against the Weight of the
                 Evidence Taken As A Whole ....................................................................12

    II.     Pylon's Evidence Of Obviousness Was Insufficient To Overcome
          The Presumption Of Validity Of The '974 Patent...............................................18

          A.      The Court's Order Barred Pylon From Arguing Obviousness
                 Based on the '793 Patent and the '214 Patent Alone or In
                 Combination With Each Other ...................................................................19

          B.      Pylon Did Not Present Any Evidence of Obviousness Based
                 on the '793 Patent and the '214 Patent Alone or In Combination
                 With Each Other .......................................................................................20

          C.      The '793 Patent and the '214 Patent, Alone or In Combination
                 With Each Other, Would Not Support an Obviousness Defense
                 to the '974 Patent.....................................................................................21

    III.    Pylon's Evidence Of Obviousness Was Insufficient To Overcome The
          Presumption Of Validity Of The '434 Patent......................................................23

          A.      The Court's Order Barred Pylon From Arguing Obviousness
                 Based on the '394 Patent and the '507 Patent Alone or In
                 Combination With Each Other ...................................................................25

B.      Pylon Did Not Present Any Evidence of Obviousness Based
        on the '394 Patent and the '507 Patent Alone or In Combination
        With Each Other ......................................................................................... 25

C.      The '394 Patent and the '507 Patent Alone or In Combination
        With Each Other Would Not Support an Obviousness Defense
        to the '434 Patent ....................................................................................... 26

IV.     The Jury's Verdicts Of Obviousness Of Claims 1 And 8 Of The '974
        Patent And Claims 1 And 5 Of The '434 Patent Were  Against The
        Weight Of The Evidence ........................................................................................ 27

V.      In View Of The Verdict Of Infringement Of Claim 5 Of The '434
        Patent, A Verdict Of Infringement Of Dependent Claim 7 Was
        Compelled By The Court's Claim Construction And The
        Uncontested Evidence ........................................................................................... 32

VI.     Pylon's Improper Expert Testimony And Closing Argument Merit
        The Grant Of A New Trial On The Issues Discussed Above ................................ 33

        A.      Pylon's Expert Testimony Was Not Disclosed In Its
                Expert's Reports ......................................................................................... 34

        B.      Pylon's Expert's Fact Testimony Was Not Disclosed,
                In Reports Or In Any Other Form ............................................................. 35

        C.      Pylon's Counsel Made An Improper Closing Argument ........................ 36

CONCLUSION ...................................................................................................................... 39

# TABLE OF AUTHORITIES

## Cases

*Al-Site Corp. v. VSI Int'l, Inc.*,
174 F.3d 1308 (Fed. Cir. 1999) ................................................................30

*Brown v. Barbacid*,
276 F.3d 1327 (Fed. Cir. 2002) ................................................................9

*Callaway Golf v. Acushnet*,
585 F. Supp. 2d 600 (D. Del. 2008) ..........................................................29

*Crocs, Inc. v. Int'l Trade Comm'n*,
598 F.3d 1294 (Fed. Cir. 2010) .................................................23, 27, 29

*Davis v. Reddy*,
620 F.2d 885 (C.C.P.A. 1980) ..................................................................8

*Fineman v. Armstrong World Indus., Inc.*,
980 F.2d 171 (3d Cir. 1992) ..............................................................36, 38

*Finnigan Corp. v. Int'l Trade Comm'n*,
180 F.3d 1354 (Fed. Cir. 1999) ..............................................................10

*Gambro Lundia AB v. Baxter Healthcare Corp.*,
110 F.3d 1573 (Fed. Cir. 1997) ................................................................5

*GemStar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*,
383 F.3d 1352 (Fed. Cir. 2004) ................................................................8

*Int'l Rectifier Corp. v. IXYS Corp.*,
361 F.3d 1363 (Fed. Cir. 2004) .........................................................6, 38

*Intel Corp. v. Broadcom Corp.*,
C.A. No. 00-796-SLR, 2003 WL 360256 (D. Del. Feb. 13, 2003) ...............33

*Jamesbury Corp. v. Litton Indus. Prods., Inc.*,
756 F.2d 1556 (Fed. Cir. 1985) ..............................................................37

*Juicy Whip, Inc. v. Orange Bang, Inc.*,
292 F.3d 728 (Fed. Cir. 2002) ...........................................................9, 10

*Koito Mfg. Co. v. Turn-Key-Tech, LLC*,
381 F.3d 1142 (Fed. Cir. 2004) .........................................................20, 25

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) ..............................................................................21

*LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*,
275 F.3d 1347 (Fed. Cir. 2002) ...................................................................33

*McGinley v. Franklin Sports, Inc.*,
262 F.3d 1339 (Fed. Cir. 2001) ...................................................................21

*Medichem, S.A. v. Rolabo, S.L.*,
437 F.3d 1157 (Fed. Cir. 2006) ................................................................8, 9

*Motorola, Inc. v. Interdigital Corp.*,
121 F.3d 1461 (Fed. Cir. 1997) ...........................................................23, 27

*Oney v. Ratliff*,
182 F.3d 893 (Fed. Cir. 1999) .......................................................................9

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
522 F.3d 1299 (Fed. Cir. 2008) ...........................................................23, 27

*Power-One, Inc. v. Artesyn Techs., Inc.*,
599 F.3d 1343 (Fed. Cir. 2010) ...........................................................20, 30

*Price v. Symsek*,
988 F.2d 1187 (Fed. Cir. 1993) .....................................................................5

*Richardson-Vicks, Inc. v. Upjohn Co.*,
C.A. No. 93-556-SLR, 1996 WL 31209 (D. Del. Jan. 17, 1996) ................12

*Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*,
264 F.3d 1344 (Fed. Cir. 2001) ...................................................................11

*Singh v. Brake*,
222 F.3d 1362 (Fed. Cir. 2000) ...............................................................7, 38

*Spalding & Evenflo Cos. v. Acushnet Co.*,
718 F. Supp. 1023 (D. Mass. 1989) ..............................................................10

*Sud-Chemie, Inc. v. Multisorb Techs., Inc.*,
554 F.3d 1001 (Fed. Cir. 2009) ...................................................................28

*Syngenta Seeds, Inc. v. Monsanto Co.*,
404 F. Supp. 2d 594 (D. Del. 2005) .............................................................12

*The Barbed Wire Patent Cases*,
143 U.S. 275 (1892) ......................................................................................10

*Woodland Trust v. Flowertree Nursery, Inc.*,
148 F.3d 1368 (Fed. Cir. 1998) ...........................................................5, 9, 11

**Statutes**

35 U.S.C. § 102(f) .................................................................................................................2, 5

35 U.S.C. § 103 ....................................................................................................................2, 23

## INTRODUCTION

This is a patent case.  The technology in question is windshield-wiper blades—in particular, a type of bracketless wiper blade known as a beam blade.  Before trial, the Court ruled on summary judgment that defendant Pylon Manufacturing Corporation had infringed one of plaintiff Robert Bosch LLC's asserted patents, U.S. Patent No. 6,292,974 ("the '974 patent") (*see* D.I. 271).  The Court's summary judgment decisions, its other pretrial rulings, and the parties' agreements left the following issues for trial:

     * Pylon's derivation and obviousness defenses to Bosch's '974 patent;

     * Bosch's infringement charge against Pylon with respect to Bosch's U.S. Patent No. 6,675,434 ("the '434 patent"), and Pylon's obviousness defense to that patent; and

     * Bosch's infringement charge against Pylon with respect to Bosch's U.S. Patent No. 6,944,905 ("the '905 patent"), and Pylon's obviousness defense to that patent.

The Court held a jury trial from April 15 to April 23, 2010.  On April 21, 2010, Bosch made an oral motion for judgment as a matter of law on its claims against Pylon and Pylon's defenses to those claims (T. Tr. at 1322:2–1323:14).  On April 23, 2010, the jury returned its verdict:  Pylon infringed the asserted claim of the '905 patent, and that claim was valid;  Pylon infringed claim 13 of the '434 patent, and that claim was valid;  claims 1 and 8 of the '974 patent were invalid for derivation and for obviousness, claims 1 and 5 of the '434 patent were infringed but were invalid for obviousness, and claim 7 of the '434 patent was valid but not infringed.

Bosch hereby renews its motion for judgment as a matter of law, or in the alternative moves for a new trial on the issues of derivation of claims 1 and 8 of the '974 patent, obviousness of claims 1 and 8 of the '974 patent, obviousness of claims 1 and 5 of the '434 patent, and infringement of claim 7 of the '434 patent.

## SUMMARY OF ARGUMENT

1.  The jury's verdict that claims 1 and 8 of the '974 patent (PTX 1) are invalid under 35 U.S.C. § 102(f) because the named Bosch inventors derived the invention from Johannes Fehrsen is not supported by substantial evidence. In support of this theory, Pylon presented only (i) the oral testimony of Mr. Fehrsen, (ii) Mr. Fehrsen's 1992 meeting notes (PTX 113), and (iii) the oral testimony of Mr. Fehrsen's colleague Mr. Swanepoel. This evidence is, as a matter of law, insufficient to overcome the presumption of validity and establish derivation. Moreover, the jury's verdict of derivation is against the weight of the evidence.

2.  The jury's verdict that claims 1 and 8 of the '974 patent are invalid under 35 U.S.C. § 103 in view of two prior-art patents, U.S. Patent Nos. 3,879,793 (DTX 51) and 3,881,214 (DTX 52), is not supported by substantial evidence. Pylon did not argue, and by Court order was not permitted to argue, that the prior art the jury relied on—the '793 patent and the '214 patent, either alone or in combination—rendered obvious the asserted claims of the '974 patent, nor would the evidence have supported such an argument. Moreover, the jury's verdict of obviousness is against the weight of the evidence.

3.  The jury's verdict that claims 1 and 5 of the '434 patent are invalid under 35 U.S.C. § 103 in view of two prior art patents, U.S. Patent Nos. 3,083,394 (DTX 73) and 3,116,507 (DTX 74), is not supported by substantial evidence. Pylon did not argue, and by Court order was not permitted to argue, that the prior art the jury relied on—the '394 patent and the '507 patent, either alone or in combination—rendered obvious the asserted claims of the '434 patent, nor would the evidence have supported such an argument. Moreover, the jury's verdict of obviousness is against the weight of the evidence.

4.  The jury's verdict that Pylon did not infringe claim 7 of the '434 patent is not supported by substantial evidence. Claim 7 depends from claim 5, which the jury found to be

infringed, and the only limitation claim 7 adds is that the claimed detent protrudes from the "long side" of the support element.  In view of the Court's construction of the "long side" claim limitation, which rejected the "edge" argument that Pylon proposed and that was the basis of Pylon's non-infringement argument to the jury, no reasonable jury that found claim 5 to be infringed could have found Pylon's Generation 2 and 3 wiper blades not to also infringe claim 7.

5.  If the Court does not enter JMOL on the grounds described in each of paragraphs 1–4 above, then Pylon's trial conduct, including (i) eliciting opinions from its technical expert that were not disclosed in any of his expert reports, (ii) eliciting fact testimony and related opinions from its technical expert that were not disclosed at any point before trial, including referring to alleged prior-art documents that were never produced or disclosed, and (iii) making improper arguments during closing, including arguing to the jury that Pylon did not infringe the '974 patent despite the Court's summary judgment ruling of infringement, independently warrants grant of a new trial.

## FACTS AND ARGUMENT

## I.   PYLON'S EVIDENCE OF DERIVATION WAS INSUFFICIENT TO OVERCOME THE PRESUMPTION OF VALIDITY OF THE '974 PATENT

| Claim | No | Yes | Prior Inventor(s) |
|-------|-----|-----|-------------------|
| 1 | ☐ | ☑ | ☑ Johannes Fehrsen<br>☐ Adriaan Swanepoel |
| 8 | ☐ | ☑ | ☑ Johannes Fehrsen<br>☐ Adriaan Swanepoel |

One of the named inventors on Bosch's '974 patent is Wilfried Merkel, an employee of Robert Bosch GmbH in Germany (*see* PTX 1).  Mr. Merkel testified at trial about his years of research, development, and engineering work in the windshield-wiper field, the millions of dollars that Bosch companies spend each year on such development work,  the hundreds of other

Bosch company employees who also do such work, and the development and testing facilities where the work is performed (Merkel, T. Tr. at 341:7–342:14; 347:4–348:10).

However, Pylon contended that Bosch's '974 patent did not result from Bosch's own development work, but instead was copied from another company. As described in more detail below, Pylon presented the testimony of two South African men, Johannes Fehrsen and Adriaan Swanepoel, in support of this theory. In the early 1990s, the two men were affiliated with AMIC, a business unit of a South African mining and industrial conglomerate.[1] Mr. Swanepoel had developed a beam-blade concept that AMIC sought to commercialize.[2] He and Mr. Fehrsen brought the idea to Robert Bosch GmbH for the two companies to jointly develop.[3] AMIC and Bosch worked together on AMIC's "Variflex" tapered-beam technology from 1991 to 1996.[4] However, the project did not result in a commercial product, and in 1998, AMIC sold its technology to an American company (and Bosch competitor) named Trico.[5]

In September of 1992, almost eighteen years before the trial in this case, Mr. Fehrsen attended a meeting with Bosch employees, including Mr. Merkel.[6] Both Mr. Fehrsen and Mr. Merkel testified that during this meeting, AMIC and Bosch discussed ideas later described in the Bosch '974 patent.[7] Mr. Merkel testified that he and a Bosch co-inventor had made the invention, described the idea to Mr. Fehrsen, and sketched it for him on a flip chart, while Mr. Fehrsen took notes.[8] Mr. Fehrsen testified that in fact it was he who made the invention, and that his notes (which do not indicate whose idea they reflect) were made as a way of explaining the

---

[1]     Fehrsen, T. Tr. at 533:15–534:1; Swanepoel, T. Tr. at 1230:21–1232:2.
[2]     Fehrsen, T. Tr. at 532:22–533:7; 534:21–25.
[3]     Fehrsen, T. Tr. at 537:5–19.
[4]     Fehrsen, T. Tr. at 537:22–538:2.
[5]     Fehrsen, T. Tr. at 582:3–15.
[6]     Fehrsen, T. Tr. at 562:24–563:10.
[7]     Merkel, T. Tr. at 410:24–411:6; 424:6–17; Fehrsen, T. Tr. at 571:9–14.
[8]     Merkel, T. Tr. at 409:15–22.

invention to Mr. Merkel and his Bosch colleagues.[9]  This conflicting testimony about the 1992 meeting was the basis for Pylon's defense that the asserted claims of the '974 patent were invalid because Bosch had stolen the invention from AMIC.

At trial, the jury found claims 1 and 8 of Bosch's '974 patent invalid under 35 U.S.C. § 102(f) on the theory that Johannes Fehrsen, alone, had conceived of the inventions of those claims, and that Mr. Fehrsen communicated his inventions to the named Bosch inventors before they themselves made the invention. *See, e.g., Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1576 (Fed. Cir. 1997) ("To show derivation, the party asserting invalidity must prove both prior conception of the invention by another and communication of that conception to the patentee.").

However, Pylon did not present any evidence that Mr. Fehrsen ever conceived of the invention of claim 8.

Further, Pylon did not present any evidence corroborating Mr. Fehrsen's testimony that he communicated the invention of claim 1 to any of the Bosch inventors. *See, e.g., Price v. Symsek*, 988 F.2d 1187, 1194 (Fed. Cir. 1993) ("Without some type of corroborating evidence, an alleged inventor's testimony cannot satisfy the 'clear and convincing evidence' standard.").

And Pylon's only evidence corroborating that Mr. Fehrsen ever even conceived of the invention of claim 1 was the testimony of his colleague Mr. Swanepoel, which as a matter of law is not sufficient to be clear and convincing evidence of derivation. *See, e.g., Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed. Cir. 1998) ("There is a very heavy burden to be met by one challenging validity when the only evidence is the oral testimony of interested persons and their friends, particularly as to long-past events.").

---

[9]      Fehrsen, T. Tr. at 599:18–600:22; 614:23–615:7.

Finally, the jury's conclusion that Pylon had presented clear and convincing evidence of derivation is against the weight of the evidence taken as a whole, including, for example, the uncontested evidence about Mr. Fehrsen's conduct after his 1992 meeting with Bosch. Such conduct is inconsistent with Mr. Fehrsen's claim that he made the invention of claim 1 of the '974 patent, and instead tends to corroborate Mr. Merkel's testimony that Mr. Merkel and his Bosch colleagues made the invention.

### A.     Pylon Presented No Evidence of Derivation of Claim 8 of the '974 Patent

Claim 8 depends upon claim 1 and adds the limitation "wherein said leading-edge face extends at least nearly over an entire length of the wiper blade" (PTX 1 at 4:53–55). Mr. Fehrsen did not testify about whether his conception included this limitation. When this inquiry was made to Mr. Swanepoel, he testified that he could "not recall any discussion on the lengthwise extent of such a spoiler" (Swanepoel, T. Tr. at 1248:10–11[10]). Pylon presented no evidence of prior conception by Mr. Fehrsen of the invention of claim 8. The Court should therefore enter judgment for Bosch on the derivation issue with respect to claim 8. *See, e.g., Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1376–77 (Fed. Cir. 2004) (affirming summary judgment of

---

[10] Swanepoel, T. Tr. at 1248:1–15:

> Q.   Okay. Now, Mr. Swanepoel, we're looking at a cross-section here, but was there an explanation as to how far on the beam the spoiler would go? This wedge? So we have a curved beam, and what was described to you as putting a wedge, a rubber wedge, on top of the beam. My question to you is, was there an understanding as to whether that wedge would fill all or part of the surface of that beam?

> A.   I do not recall that there was any discussion on the lengthwise extent of such a spoiler, but it was readily understood by myself that it would -- it would depend on the necessity. If necessary, it would be the full span. If not, it would be partial. There was -- there was no reason for it to be any specific extent.

no derivation when the accused infringer presented no evidence of prior conception of all limitations of claim); *Singh v. Brake*, 222 F.3d 1362, 1367 (Fed. Cir. 2000) ("conception must encompass all limitations of the claimed invention").

### B. Pylon Provided No Evidence Corroborating Mr. Fehrsen's Alleged Communication To Bosch of the Invention of Claim 1 of the '974 Patent

Mr. Fehrsen testified that he communicated his conception of claim 1 of the '974 patent to Bosch GmbH representatives, including named inventor Mr. Merkel, at a September 17, 1992 meeting in Germany (*see* Fehrsen, T. Tr. at 557:24–558:8; 562:24–564:10). Other than Mr. Fehrsen's testimony, the only evidence presented to the jury concerning this meeting was (i) the testimony of Mr. Merkel, (ii) the testimony of Mr. Swanepoel, and (iii) Mr. Fehrsen's meeting notes (PTX 113). None of this evidence corroborated Mr. Fehrsen's testimony.

First, Mr. Merkel testified that it was he, not Mr. Fehrsen, who communicated the invention at the meeting; he described drawing the invention on a large flip chart while Mr. Fehrsen took notes (*see, e.g.*, Merkel, T. Tr. at 409:12–22; *see generally* Merkel, T. Tr. at 386:5–392:1; 408:20–412:4).

Second, Mr. Swanepoel testified that he did not "have any idea what happened at that meeting" (and Pylon's counsel agreed, noting during the testimony that "The witness has no idea of what went on in Germany. He wasn't there.")[11] Mr. Swanepoel did not corroborate Mr. Fehrsen's testimony about what took place at the meeting.

---

[11] Swanepoel, T. Tr. at 1275:14–1276:13 (emphasis added):

> Q.    But just to be clear, <u>you were not at the meeting with Bosch where those notes were taken; is that correct?</u>
>
> A.    <u>Correct.</u>

(continued...)

Finally, Mr. Fehrsen's meeting notes do not indicate whether the idea he sketched was something that he told Bosch, or something that Bosch told him. They do not indicate which version of the events of the meeting—his, or Mr. Merkel's—is correct (*see* Fehrsen, T. Tr. at 615:6–7: "Q. So they don't say at all whose idea it is; correct? A. Yes."). The notes do not corroborate Mr. Fehrsen's testimony that he communicated the invention to Bosch. *See, e.g., GemStar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1382–83 (Fed. Cir. 2004); *Davis v. Reddy*, 620 F.2d 885, 889 (C.C.P.A. 1980) (notes did not corroborate because "it is not possible to tell what portion of the notes reflect Frederiksen's independent thinking as opposed to the portions which were written in response to Reddy's disclosure"). And regardless of their content, because the notes are unwitnessed and were created by Mr. Fehrsen himself, they are insufficient as a matter of law to corroborate his testimony. *See, e.g., Medichem, S.A. v. Rolabo,*

---

> Q.    Okay. Now, and I'm just going throw this out there. Is it possible, sir, that during this meeting, it was Bosch engineers who drew those designs up on a whiteboard? Regardless of whether you or Mr. Fehrsen had discussed the ideas before, is it possible that in that meeting, it was Bosch engineers who drew that idea up on the whiteboard?
>
> MR. FELDMAN: Objection. Objection as to what was possible. The witness has no idea of what went on in Germany. He wasn't there.
>
> MR. HANNEMANN: I'm happy to stipulate he has no basis for knowing.
>
> THE COURT: Just let me think about this for awhile. I think the question, I think I will sustain the objection. However, I think you can state that, whether he really has any idea what happened. I mean, I think that's an appropriate question.
>
> MR. HANNEMANN: Okay. Mr. Swanepoel, do you have any idea what happened at that meeting?
>
> A.    No.

*S.L.*, 437 F.3d 1157, 1172 (Fed. Cir. 2006) (finding no independent corroborative value in an inventor's unwitnessed notebook); *Brown v. Barbacid*, 276 F.3d 1327, 1335 (Fed. Cir. 2002) (holding that "an inventor's own unwitnessed documentation does not corroborate an inventor's testimony about inventive facts").

### C.      Pylon Did Not Present Sufficient Corroboration of Conception of Claim 1

Pylon presented no written evidence corroborating Mr. Fehrsen's claim to have conceived of the invention of claim 1 of the '974 patent before his September 1992 meeting with Bosch. The only evidence Pylon presented to corroborate Mr. Fehrsen's claim was the testimony of Mr. Fehrsen's colleague, Mr. Swanepoel, which as a matter of law is not sufficient to be clear and convincing evidence of derivation.

It is insufficient because Mr. Swanepoel is a long-time friend and colleague of Mr. Fehrsen (Swanepoel, T. Tr. at 1227:25–1229:18; 1230:6–9). *See, e.g., Woodland Trust*, 148 F.3d at 1371; *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 743 (Fed. Cir. 2002) (noting that witness was interested by virtue of his longtime acquaintance with a defendant and business relationship with that defendant's brother-in-law; another witness was interested by virtue of having been a salesman who sold products to defendant); *Oney v. Ratliff*, 182 F.3d 893, 896 (Fed. Cir. 1999) ("The uncorroborated oral testimony of Mr. Ratliff, as the inventor, and his close associates would be insufficient to prove invalidity.").

It is insufficient because, according to Mr. Swanepoel, he himself may be a co-inventor with Mr. Fehrsen (Swanepoel, T. Tr. at 1275:4–9). *See, e.g., Medichem*, 437 F.3d at 1171 ("One consequence of the independence requirement is that testimony of one co-inventor cannot be used to help corroborate the testimony of another.").

It is insufficient because Mr. Swanepoel, who consults for and receives royalties from Bosch competitor Trico (Swanepoel, T. Tr. at 1212:5–8,15–16), and who, were it not for Bosch's success, might be seen as a pioneer of beam-blade technology (Swanepoel, T. Tr. at 1221:15–1223:1; 1255:12–19), and who believes that Bosch is infringing his own beam-bade patent (Swanepoel, T. Tr. at 1267:15–1268:7) (though the Bosch competitor who owns the patent, Trico, considered his allegations and yet never asserted the patent against Bosch, Swanepoel, T. Tr. at 1282:16–24) is himself an interested witness. *See Juicy Whip*, 292 F.3d at 743; *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1368 (Fed. Cir. 1999) ("A witness who testifies to antedating the invention of the patent-in-suit can be expected to derive a sense of professional or personnel accomplishment in being the first in the field, and in this sense is not uninterested in the outcome of the litigation, even if that witness is not claiming entitlement to a patent."); *Spalding & Evenflo Cos. v. Acushnet Co.*, 718 F. Supp. 1023, 1037 (D. Mass. 1989) (finding that an employee of a non-party competitor had an interest in the outcome of the suit and thus required corroboration).

And it is insufficient because it is the oral testimony of a witness whose testimony was enhanced by his preparation by Pylon's attorneys. For example, despite the absence of any documentary evidence at all, as a result of his preparation by Pylon's lawyers during the three days between his second deposition in this case and his trial testimony, Mr. Swanepoel's testimony about when Mr. Fehrsen first told him of his conception of the '974 patent's invention changed from "sometime during 1991 or 1992" (at his April 18, 2010 deposition) to "September 1991" (his trial testimony on April 21, 2010) (Swanepoel, T. Tr. at 1272:15–1274:11). *See, e.g., The Barbed Wire Patent Cases*, 143 U.S. 275, 284 (1892) ("Witnesses whose memories are prodded by the eagerness of interested parties to elicit testimony favorable to themselves are not

usually to be depended upon for accurate information."); *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1351 (Fed. Cir. 2001) ("In contrast to contemporaneous documentary evidence, however, post-invention oral testimony is more suspect, as there is more of a risk that the witness may have a litigation-inspired motive to corroborate the inventor's testimony, and that the testimony may be inaccurate.").

The Federal Circuit has prescribed a rule of reason to be used when considering claims of prior invention and derivation. *Woodland Trust*, 148 F.3d at 1371 (describing consideration of "(1) the relationship between the corroborating witness and the alleged prior user, (2) the time period between the event and trial, (3) the interest of the corroborating witness in the subject matter in suit, (4) contradiction or impeachment of the witness' testimony, (5) the extent and details of the corroborating testimony, (6) the witness' familiarity with the subject matter of the patented invention and the prior use, (7) probability that a prior use could occur considering the state of the art at the time, (8) impact of the invention on the industry, and the commercial value of its practice" as constituting a "rule of reason").  Under that rule of reason, Mr. Fehrsen's undocumented claim of prior invention, supported only by the undocumented testimony of his friend, colleague, potential co-inventor, failed beam-blade innovator, and Bosch competitor Mr. Swanepoel, is not enough to overcome the presumption of validity and be clear and convincing evidence of prior invention, regardless of the two witnesses' credibility. *See id.* at 1373 ("The relationship of the witnesses and the fact that the asserted prior uses ended twenty years before the trial, and were abandoned until the defendant reportedly learned of the patentee's practices, underscore the failure of this oral evidence to provide clear and convincing evidence of prior knowledge and use.").

**D.     The Jury's Derivation Finding Is Against the Weight of the Evidence Taken As A Whole**

A new trial should be granted when the jury's verdict "was against the weight of the evidence," and a new trial is necessary to prevent a "miscarriage of justice." *Richardson-Vicks, Inc. v. Upjohn Co.*, No. 93-556-SLR, 1996 WL 31209, at *1 (D. Del. Jan. 17, 1996). "Unlike a JMOL motion, the court need not view the evidence in the light most favorable to the verdict winner." *Syngenta Seeds, Inc. v. Monsanto Co.*, 404 F. Supp. 2d 594, 600 (D. Del. 2005).

As noted above, Mr. Merkel testified that it was he and his co-inventor, Mr. Leutsch, who first suggested solving the high-speed quality problems that Bosch and AMIC were facing by using a spoiler running the length of the top of the beam:

> Q.    And who proposed that idea?
>
> A.    This idea was proposed by Mr. Leutsch and me.
>
> Q.    And could you describe that elastic spoiler design that was proposed by you and Mr. Leutsch at the September 17th, 1992, meeting?
>
> A.    Yes. This design was the same design which we disclosed in our patent application.
>
> Q.    And how was your design communicated to the attendees at that meeting?
>
> A.    The way it was, that Mr. Leutsch explained it, and I was standing at a so-called flip chart, and making – and had made such sketches.
>
> Q.    A flip chart where the pages turn?
>
> A.    Yes.

(Merkel, T. Tr. at 388:4–17; *see generally* Merkel, T. Tr. at 386:5–392:1; 408:20–412:4.)

As also noted above, Mr. Fehrsen testified that in fact it was he, not Mr. Merkel, who first proposed the invention of claim 1 of the '974 patent, though Mr. Fehrsen claimed that he drew a

two-centimeter sketch in the margin of a sheet of his meeting notes to explain the idea to the others in the meeting around a conference table big enough for ten to fourteen people, not a large drawing on a pad as he did in the courtroom and as Mr. Merkel described doing (Fehrsen, T. Tr. at 599:18–601:4). Based on its verdict the jury credited that testimony, not Mr. Merkel's.[12] But the conclusion that Mr. Fehrsen, not Mr. Merkel, was accurately recounting the events of the September 1992 meeting contradicts a great deal of other evidence, beyond the two witnesses' testimony about who first proposed the idea, that the jury should have considered.

For example, the jury's verdict overlooks that in 1993, 1995, and 1998, Mr. Swanepoel wrote lengthy manuals describing all of AMIC's "theory and know-how" concerning beam-blade technology (Swanepoel, T. Tr. at 1283:4–12; *see generally* Swanepoel, T. Tr. at 1282:25–1285:5). These manuals mentioned the "wind-lift problem" that the invention of the '974 patent was created to solve (Swanepoel, T. Tr. at 1285:1–2). However, the manuals did not refer to the spoiler invention (Swanepoel, T. Tr. at 1285:3–5). If the spoiler invention of the '974 patent were truly an AMIC innovation, it would have been included in the 136 pages of manuals.[13]

The jury's verdict also overlooks Mr. Fehrsen's admission that at the time of the September 1992 meeting, AMIC had expertise with the metal-beam aspects of beam-blade technology, but "Not particularly" any expertise with other aspects of beam-blade design,

---

[12]    For the jury to credit Mr. Fehrsen's testimony, it must have accepted his explanation that the reason he drew the two-centimeter sketch in the margin of his notebook when explaining his idea to the other attendees at the meeting was because "one is much more able to draw a smaller figure accurately" (Fehrsen, T. Tr. at 601:16–17). No reasonable jury could have accepted this explanation, because it is contradicted by Mr. Fehrsen's own conduct, when minutes earlier he had demonstrated to the jury the invention of the '974 patent exactly as Mr. Merkel did in 1992, by using a flip chart and making a large diagram, not by drawing a tiny sketch. (Fehrsen, T. Tr. at 551:9–22).

[13]    These manuals, which were provided to Pylon as early as March 25, 2010, were not produced to Bosch until approximately 2 hours before Mr. Swanepoel's April 18, 2010 deposition.

including rubber technology (Fehrsen, T. Tr. at 607:12–609:25). This admission is inconsistent with Mr. Fehrsen's suggestion that it was AMIC, not Bosch, that understood beam-blade design well enough to propose the spoiler inventions of the '974 patent.

The jury's verdict also overlooks Mr. Merkel's testimony that at the 1992 meeting, Mr. Fehrsen was skeptical that the invention later described in the '974 patent would work (Merkel, T. Tr. at 389:20–25; 390:16–22). Mr. Fehrsen admitted that his notes contain a second, different proposal, the so-called inclined-beam approach to solving the high-speed lift problem (Fehrsen, T. Tr. at 552:11–18; 565:12–16). The jury's verdict overlooks Mr. Fehrsen's admissions at trial that it was this second, different solution that he circled in his notes (see Fehrsen, T. Tr. at 610:9–13), and that it was this second, different solution that he made an "action item" for AMIC when he returned from the meeting (see Fehrsen, T. Tr. at 610:17–611:17). These admissions are consistent with Mr. Merkel's understanding that Mr. Fehrsen rejected the '974 invention proposed by Bosch, which Mr. Fehrsen did not think would work, in favor of the inclined-beam solution Mr. Fehrsen proposed. They are inconsistent with Mr. Fehrsen's testimony describing the September 1992 meeting.

The jury's verdict also overlooks the testimony describing what happened five and six years after the September 1992 meeting. First, in 1997, after the Bosch-AMIC working relationship had been terminated (Fehrsen, T. Tr. at 576:21–577:21), AMIC and Bosch held a meeting in Leipzig. Mr. Swanepoel testified that he and Mr. Fehrsen—who was on vacation at the time in Germany—were both there (see Swanepoel, T. Tr. at 1280:4–14), and that during the meeting Mr. Merkel showed them a prototype of Bosch's commercial beam blade, including the spoiler (see Swanepoel, T. Tr. at 1255:23–1256:1; 1280:17–19). Mr. Swanepoel admitted that during that meeting, neither he nor Mr. Fehrsen claimed ownership of the spoiler invention

- 14 -

(Swanepoel, T. Tr. at 1280:20–23). This admission is inconsistent with his and Mr. Fehrsen's testimony that the '974 patent reflected an AMIC invention, not a Bosch invention.[14] If it were an AMIC invention, the AMIC inventors would have protested that Bosch was not permitted to use their technology.

Second, in 1998, AMIC sold its beam-blade technology to a Bosch competitor named Trico (*see, e.g.*, Fehrsen, T. Tr. at 615:8–17). Mr. Fehrsen himself participated in negotiating the agreement on behalf of AMIC (*see id.* at 615:14–20). In that transaction, which took place after Mr. Fehrsen and Mr. Swanepoel had seen Bosch's prototype at the December 1997 Leipzig meeting, AMIC warranted to Trico that Bosch "had not made any use of any information disclosed by AMIC to Bosch" (T. Tr. at 622:8–10; *see, e.g.*, T. Tr. at 622:8–15, confirming that the warranty was made "after your December 1997 meeting with Mr. Merkel"). This warranty expressly contradicts Mr. Fehrsen's trial testimony that the inventions described in the Bosch '974 patent were actually AMIC information disclosed to Bosch during the September 1992 meeting. It is consistent instead with Mr. Merkel's testimony that the inventions were Bosch inventions made by him and his colleague Mr. Leutsch and disclosed by them to Mr. Fehrsen during the 1992 meeting.[15]

As a result of the transaction, Trico later began selling its own beam-blade product based on the AMIC technology. At trial, Mr. Fehrsen admitted that Trico's beam-blade product is shown in the figures of Mr. Swanepoel's '564 patent (*see* Fehrsen, T. Tr. at 633:24–635:1); that

---

[14]     Mr. Swanepoel also testified that Bosch was looking for a license in general to sell its beam blades, implying that Bosch's spoiler was AMIC technology (Swanepoel, T. Tr. at 1280:24–1281:7). However, when shown his own memo from 1999, he admitted that Bosch in fact was only seeking a license on one specific patent that is not relevant to the invention of the '974 patent (Swanepoel, T. Tr. at 1282:10–24).

[15]     AMIC also warranted that there were no joint inventions made in the course of the Bosch/AMIC relationship (*see, e.g.*, Fehrsen, T. Tr. at 620:15–20).

patent (DTX 71), like the Trico product, does not include a spoiler. These facts, too, contradict Mr. Fehrsen's testimony that the spoiler of the '974 patent was an AMIC invention; if it were AMIC technology, not a Bosch invention, it would have been disclosed by AMIC in its patent applications (it was not, *see* Fehrsen, T. Tr. at 641:19–21), and would have been included in Trico's product.

After buying AMIC's beam-blade technology, Trico learned of Bosch's patent applications, including the application that led to the issuance of the '974 patent. The warranties AMIC made as part of the sale to Trico required AMIC to sue Bosch, at AMIC's expense, if it was discovered that Bosch was using AMIC technology (*see, e.g.*, Fehrsen, T. Tr. at 622:20–24). Trico raised the issue with AMIC, which then raised the issue with Bosch (*see, e.g.*, Fehrsen, T. Tr. at 640:10–17). In its response, Bosch explained that the inventions were Bosch's technology, not AMIC's (*see* Fehrsen, T. Tr. at 640:18–20). And having heard that explanation, AMIC never sued Bosch (*see, e.g.*, Fehrsen, T. Tr. at 623:6–9). Nor did either AMIC or Trico raise the issue with the Patent Office (*see, e.g.*, Fehrsen, T. Tr. at 641:14–18). This course of conduct, too, supports Mr. Merkel's testimony that the technology in question was invented by Bosch, and contradicts Mr. Fehrsen's claim to have invented it.

All of the above evidence is uncontested and so should have been accepted by the jury without regard for witness credibility. But the jury's verdict also ignores the credibility issues associated with Mr. Fehrsen's testimony, which was developed in the course of "lengthy meetings" with Pylon's counsel (Fehrsen, T. Tr. at 641:22–642:4), for which Pylon's counsel paid Mr. Fehrsen (Fehrsen, T. Tr. at 527:9–15).

For example, during Pylon's cross-examination of Mr. Merkel, Pylon's counsel spent four pages of testimony attempting to establish that Mr. Leutsch had not been part of the

September 1992 meeting (Merkel, T. Tr. at 450:14–454:21).  During his own cross-examination, Mr. Fehrsen, consistent with Pylon's theory raised earlier with Mr. Merkel, denied knowing whether Mr. Leutsch had been at the meeting to witness the communication in question (Fehrsen, T. Tr. at 591:13–592:4).  However, his prior deposition testimony, when he had been asked the same question by Pylon's counsel, was clear on this point:  "Yes, he was" (Fehrsen, T. Tr. at 592:14–593:13).[16]

For another example, during his cross-examination, when confronted with some of his prior testimony, Mr. Fehrsen denied that he had reviewed and corrected his deposition transcript to check "individual words" and said that he didn't "warrant that the -- every single word is true and correct" (Fehrsen, T. Tr. at 621:1–8).  However, further cross-examination revealed that in fact he did review and correct "individual words," including such corrections as changing "free" to "three" and making "other changes like that" (Fehrsen, T. Tr. at 621:13–24).

For another example, Mr. Fehrsen, in contradiction to both Mr. Merkel and Mr. Swanepoel, testified that he was "positive" that Mr. Swanepoel was not at the key 1997 meeting in Leipzig where Bosch showed its commercial prototype, which Mr. Fehrsen said he did not remember seeing (Fehrsen, T. Tr. at 612:19–23).  He confirmed that he remembered Mr. Swanepoel's absence very clearly, as clearly as he remembered everything else he testified about:

> Q.    How about Mr. Swanepoel?  Was he present at that meeting?

---

[16]     Fehrsen, T. Tr. at 593:8–13:

> Q.    Did Mr. Hillyer ask you this question, sir? "Was Mr. Leutsch present and in the room when you disclosed the use of an airfoil or a spoiler on a beam blade?" And did you give the answer:  "Yes, he was."
>
> A.    Yes.

- 17 -

> A.   No.
>
> Q.   You're positive that he was not there?
>
> A.   Quite correct.
>
> Q.   And you remember that just as clearly as you remember the other events in this case?
>
> A.   My wife and I were on holiday in Leipzig on our own. Nobody else came along to that meeting.

(Fehrsen, T. Tr. at 612:19–613:2 (emphasis added)).  He did not, however, remember whether Mr. Merkel had shown a prototype of the Bosch commercial beam-blade product at the Leipzig meeting, as Mr. Swanepoel, who was in fact at the meeting, later admitted (Fehrsen, T. Tr. at 613:3–13; Swanepoel, T. Tr. at 1255:23–1256:1).

Mr. Fehrsen did explain the reason for his uncertainty:  "That's a long time ago" (Fehrsen, T. Tr. at 613:14).  This testimony, at least, is absolutely correct.  The Leipzig meeting took place in 1997, and the critical meeting where someone—Mr. Merkel, or Mr. Fehrsen— disclosed the invention of the '974 patent took place five years before that, in 1992, nearly two decades before the trial in this case.  Taken as a whole, the evidence is not clear and convincing enough to overcome the presumption of validity, and does not support the jury's decision to invalidate Bosch's patent based only on the conflicting testimony about who said what at the 1992 meeting.  Judgment as a matter of law should be entered in Bosch's favor on the derivation defense as requested  above, or in the alternative, there should be a new trial on the issue.

## II.   PYLON'S EVIDENCE OF OBVIOUSNESS WAS INSUFFICIENT TO OVERCOME THE PRESUMPTION OF VALIDITY OF THE '974 PATENT

| Claim | No | Yes | Prior Art |
|-------|----|----|-----------|
| 1 | ☐ | ☑ | ☑ U.S. Patent No. 3,879,793<br>☑ U.S. Patent No. 3,881,214<br>☐ U.S. Patent No. 3,942,212<br>☐ U.S. Patent No. 5,325,564 |
| 8 | ☐ | ☑ | ☐ U.S. Patent No. 3,879,793<br>☑ U.S. Patent No. 3,881,214<br>☐ U.S. Patent No. 3,942,212<br>☐ U.S. Patent No. 5,325,564 |

At trial, the jury found claim 1 of the '974 patent invalid under 35 U.S.C. § 103 for obviousness in view of U.S. Patent No. 3,879,793 ("the '793 patent") (DTX 51) and U.S. Patent No. 3,881,214 ("the '214 patent") (DTX 52). The jury also found claim 8 of the '974 patent invalid in view of the '214 patent alone.

However, the Court's order in limine (D.I. 290) barred Pylon from arguing invalidity based on these theories.

Moreover, Pylon did not present any evidence at trial supporting these theories.

Nor could Pylon have presented any evidence supporting obviousness on these theories: the prior art the jury applied does not describe all of the elements of the claimed inventions, and there is no evidence of any motivation to combine the '793 patent and the '214 patent—both of which were already considered by the Patent Office.

### A.   The Court's Order Barred Pylon From Arguing Obviousness Based on the '793 Patent and the '214 Patent Alone or In Combination With Each Other

Before the trial, the Court issued an order limiting the prior art on which Pylon could rely at trial (D.I. 290). This order did not permit Pylon to rely on the '793 patent alone, the '214 patent alone, or the '793 patent in combination with the '214 patent as bases for its obviousness

- 19 -

defense to the '974 patent (*see* D.I. 290 at Exhibit A, p. 1).[17]  The jury's obviousness verdict—which rejected Pylon's other asserted prior art—thus conflicts with the Court's in limine order, and Bosch respectfully requests judgment as a matter of law in its favor on the obviousness of the asserted claims of the '974 patent.

### B.  Pylon Did Not Present Any Evidence of Obviousness Based on the '793 Patent and the '214 Patent Alone or In Combination With Each Other

At trial, Pylon presented no evidence that either the '793 patent or the '214 patent would by itself render claim 1 obvious.  Nor did Pylon present any evidence that a combination of the '793 and '214 patents would render claim 1 obvious.  Nor did Pylon present any evidence that the '214 patent would by itself render claim 8 obvious.[18]  When the party challenging validity fails to explain how a reference or combination of references renders a patent obvious, JMOL of non-obviousness is appropriate.  *See, e.g., Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1152 (Fed. Cir. 2004) ("Because Koito failed to articulate how the JP '082 reference anticipates or makes obvious the '268 patent, it has not presented sufficient evidence for the jury with respect to the JP '082 reference").

Pylon moreover did not present any evidence showing any motivation to combine the '793 patent and the '214 patent.  A combination cannot render a patent obvious in the absence of a motivation to combine.  *See, e.g., Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1351–52 (Fed. Cir. 2010) (affirming denial of JMOL of obviousness when all elements were present in the prior art but no motivation to combine was shown "because a patent composed of several elements is not proved obvious merely by demonstrating that each of its

---

[17]  At trial, Pylon expressly withdrew its anticipation defenses (*see* T. Tr. at 1326:25–1327:2).

[18]  *See generally* Buechele, T. Tr. at 1017:22–1022:6; 1026:1–1027:16.

elements is, independently, known in the prior art") (quoting *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007)).

**C.    The '793 Patent and the '214 Patent, Alone or In Combination With Each Other, Would Not Support an Obviousness Defense to the '974 Patent**

Claim 1 of the Bosch '974 patent (PTX 1) describes a wiper blade with a "curved, band-shaped, spring-elastic support element which distributes pressure" (the beam) and "a component . . . mounted directly to the convex surface of said support element so as to form a leading-edge face extending in a longitudinal direction of the support element . . ." (the spoiler) (PTX 1, 4:16–32).  Claim 8 depends from claim 1 and specifies that the leading-edge face of the spoiler "extends at least nearly over an entire length of the wiper blade" (PTX 1 4:53–55).

Neither the '793 patent nor the '214 patent, alone or in combination, describes a wiper blade having these features.

The '793 patent (DTX 51) is a bracketed wiper blade, not a beam blade; it does not have a curved support element (*see, e.g.*, Buechele, T. Tr. at 1113:8–14; Dubowsky, T. Tr. at 1291:23–1292:1).  And the shape to which Pylon pointed as forming a leading-edge face is an inclined portion of the bracket, not a separate spoiler (*see, e.g.*, Buechele, T. Tr. at 1113:18–23; Dubowsky, T. Tr. at 1292:2–13).  Moreover, Pylon's expert admitted that a combination of the '793 patent with a beam blade would result in an inoperable device.  (Buechele, T. Tr. at 1113:15–17, '793 patent's "spoiler" is rigid; 1110:24–1111:3, placing a rigid spoiler on a beam blade would result in an inoperable beam blade).  The '793 patent thus teaches away from the invention of the '974 patent. *See, e.g., McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1354 (Fed. Cir. 2001) ("If references taken in combination would produce a 'seemingly inoperative device,' we have held that such references teach away from the combination and thus cannot serve as predicates for a prima facie case of obviousness.").

The '214 patent (DTX 52) is not a bracketed wiper blade, but it, too, lacks the beam and spoiler described in the '974 patent. The '214 patent instead describes a wiper blade with a thermoplastic support structure and a metal backing strip that is not a spring-elastic support element; its role is to prevent twisting of the wiper blade, not to cause it to press against the windshield (Dubowsky, T. Tr. at 1296:10–17). During trial, Pylon's testimony was only that the '214 patent described the spoiler element of the '974 patent (*see* Buechele, T. Tr. at 1026:12–19).[19] Pylon did not present evidence that the '214 patent described the beam or any other element of the '974 patent (*e.g.*, the connection device also recited in claim 1 of the '974 patent) other than the spoiler.

Moreover, both the '793 patent and the '214 patent were already considered by the Patent Office in connection with the prosecution of the '974 patent (*see, e.g.,* PTX 1, Buechele, T. Tr. at 1114:19–23).[20]

Thus, it is uncontested that the prior art the jury relied on lacked the fundamental beam element of the invention claimed in the '974 patent, as well as other elements, such as the connection device, and that at least the '793 patent actually teaches away from the inventions claimed in the '974 patent. There was no evidence or argument at trial that the knowledge of one of ordinary skill in the art would add those missing elements to the prior art on which the jury relied. And both pieces of prior art were already considered by the Patent Office. This prior art is, as a matter of law, insufficient to overcome the presumption of validity and be clear and

---

[19]    While Pylon's expert claimed that a "support element" was present in figure 6 of the '214 patent, he did not attempt to show that the supposed support element was "curved," "band-shaped" or "spring elastic" or that it distributed pressure as required by claim 1 of the '974 patent (*see* Buechele, T. Tr. at 1027:4–7).

[20]    The '214 patent was before the Patent Office in the form of its French equivalent, FR 2199302 (*see* PTX 1).

convincing evidence of obviousness, particularly in view of the "especially difficult" burden of proof faced when relying solely on prior art that was before the Patent Office, a burden that arises "because a qualified government agency is presumed to have properly done its job" (D.I. 297 at 15). *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008). Judgment as a matter of law in Bosch's favor therefore should be entered on the obviousness defense to the Bosch '974 patent. *See, e.g., Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1308 (Fed. Cir. 2010) (reversing the ITC's finding of obviousness as unsupported by substantial evidence where key feature of patent was not found in prior art); *Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1466–67 (Fed. Cir. 1997) (affirming JMOL of non-obviousness when jury's verdict identified prior art references that lacked elements of the claim and were therefore "plainly insufficient" to render claims of the patent obvious).

### III. PYLON'S EVIDENCE OF OBVIOUSNESS WAS INSUFFICIENT TO OVERCOME THE PRESUMPTION OF VALIDITY OF THE '434 PATENT

| Claim | No | Yes | Prior Art |
|-------|-----|-----|-----------|
| 1 | ☐ | ☑ | ☑ U.S. Patent No. 3,083,394<br>☑ U.S. Patent No. 3,116,507<br>☐ U.S. Patent No. 5,325,564 |
| 5 | ☐ | ☑ | ☑ U.S. Patent No. 3,083,394<br>☑ U.S. Patent No. 3,116,507<br>☐ U.S. Patent No. 5,325,564 |
| 7 | ☑ | ☐ | ☐ U.S. Patent No. 3,083,394<br>☐ U.S. Patent No. 3,116,507<br>☐ U.S. Patent No. 5,325,564 |
| 13 | ☑ | ☐ | ☐ U.S. Patent No. 3,083,394<br>☐ U.S. Patent No. 3,116,507<br>☐ U.S. Patent No. 5,325,564 |

At trial, the jury found claims 1 and 5 (but not claims 7 and 13) of the '434 patent invalid under 35 U.S.C. § 103 for obviousness in view of U.S. Patent No. 3,083,394 ("the '394 patent") (DTX 73) and U.S. Patent No. 3,116,507 ("the '507 patent") (DTX 74). It is uncontested that for

purposes of the obviousness case, these two pieces of prior art, which both name the same inventor, are interchangeable; the '394 patent "doesn't add anything" to the '507 patent.[21]

Again, the Court's in limine order (D.I. 290) barred Pylon from arguing invalidity based on these theories.

Moreover, again Pylon did not present any evidence at trial supporting these theories.

Nor, again, could Pylon have presented any evidence supporting obviousness on these theories: the prior art the jury applied does not describe all of the elements of the claimed inventions, and there is no evidence of any motivation to combine the '394 patent and the '507 patents (nor would there have been any point in doing so; as noted above, both patents are interchangeable for purposes of this case). And again, the kind of technology described in these patents was already considered by the Patent Office.

---

[21] Buechele, T. Tr. at 1119:15–25:

> Q.   Okay.  There was another Scinta reference that you discussed earlier today.  And that was DTX-73, which I think could be found at Tab 19 of your book. Do you see that there, sir?
>
> A.   Yes, I do.
>
> Q.   Are you citing this reference for the same elements and combinations as you were citing the prior Scinta reference that we just looked at?
>
> A.   Yes.
>
> Q.   This reference doesn't add anything else; correct?
>
> A.   No.

**A.    The Court's Order Barred Pylon From Arguing Obviousness Based on the '394 Patent and the '507 Patent Alone or In Combination With Each Other**

As noted above, before the trial the Court issued an order limiting the prior art on which Pylon could rely at trial (D.I. 290). This order did not permit Pylon to rely on the '394 patent alone, the '507 patent alone, or a combination of the two patents as bases for its obviousness defense to the '434 patent (*see* D.I. 290 at Exhibit A, p. 1).[22] The jury's obviousness verdict— which rejected Pylon's other asserted prior art—thus violated the Court's in limine order, and Bosch respectfully requests judgment as a matter of law in its favor on the obviousness of the asserted claims of the '434 patent.

**B.    Pylon Did Not Present Any Evidence of Obviousness Based on the '394 Patent and the '507 Patent Alone or In Combination With Each Other**

At trial, Pylon presented no evidence that either the '394 patent or the '507 patent would by itself render claim 1 or claim 5 obvious. Nor did Pylon present any evidence that a combination of the two patents (which, as noted above, are cumulative of each other) would render claim 1 or claim 5 obvious.[23] When the party challenging validity fails to explain how a reference or combination of references renders a patent obvious, JMOL of non-obviousness is appropriate. *See, e.g., Koito*, 381 F.3d at 1152 ("Because Koito failed to articulate how the JP '082 reference anticipates or makes obvious the '268 patent, it has not presented sufficient evidence for the jury with respect to the JP '082 reference.").

---

[22]    At trial, Pylon expressly withdrew its anticipation defenses (*see* T. Tr. at 1326:25–1327:2).

[23]    *See generally* Buechele, T. Tr. at 1032:17–1053:4.

C.    **The '394 Patent and the '507 Patent Alone or In Combination With Each Other Would Not Support an Obviousness Defense to the '434 Patent**

Claim 1 of the Bosch '434 patent (PTX 6) describes a wiper blade with a "spring-elastic support element" (the beam); "on the side of the support element remote from the window or glass, in the middle portion of the support element, a device for attaching a driven wiper arm" (the connection device); and "the two ends of the wiper blade each being covered by a respective termination part. . . bracing itself on the wiper blade" (the end caps) (PTX 6 at 7:41–66).  Claim 5 depends from claim 1 and requires these same elements (PTX 6 at 8:17–22).

Neither the '394 patent nor the '507 patent, alone or in combination, describes a wiper blade having these features.

The '507 patent (DTX 74) is a bracketed wiper blade, not a beam blade; it does not have a spring-elastic support element (Buechele, T. Tr. at 1116:5–19; Dubowsky, T. Tr. at 1298:22–1299:1).  The only connection device disclosed in it is mounted on the bracket (*see* DTX 74 at Fig. 4).  The '507 patent only teaches that one end of the wiper blade is covered by an end cap (*e.g.,* Buechele, T. Tr. at 1034:11–17; Dubowsky, T. Tr. at 1299:17–18).  And given the Court's construction of "bracing itself on the wiper blade" as "supporting itself on both the support element and wiper strip," (D.I. 270 at 5) and the lack of a beam, the '507 patent lacks the claimed end cap element as well.

The '394 patent (DTX 73) is interchangeable with the '507 patent (Buechele, T. Tr. at 1119:15–25) and thus it, too, lacks the beam, connection device and end cap described in the '434 patent.

Moreover, Pylon's expert admitted that equivalent art to the '394 and '507 patents (that is, end caps secured to a vertebra or vertebrae of a bracketed blade), was before the Patent Office (Buechele, T. Tr. at 1116:20–1117:12; 1120:1–8).

Thus, it is uncontested that the prior art the jury relied on lacked the fundamental beam element of the invention claimed in the '434 patent (as well as other elements, such as the connection device and end caps at both ends supported on the beam). There was no evidence or argument at trial that the knowledge of one of ordinary skill in the art would add those missing elements. And both pieces of prior art were cumulative to that considered by the Patent Office. This prior art is, as a matter of law, insufficient to overcome the presumption of validity and be clear and convincing evidence of obviousness, particularly in view of the "especially difficult" burden of proof faced when relying solely on prior art that was before the Patent Office, a burden that arises "because a qualified government agency is presumed to have properly done its job" (D.I. 297 at 15). *PowerOasis*, 522 F.3d at 1304. Judgment as a matter of law in Bosch's favor therefore should be entered on the obviousness defense to the Bosch '974 patent. *See, e.g., Crocs, Inc.*, 598 F.3d at 1308; *Motorola*, 121 F.3d at 1466–67.

## IV. THE JURY'S VERDICTS OF OBVIOUSNESS OF CLAIMS 1 AND 8 OF THE '974 PATENT AND CLAIMS 1 AND 5 OF THE '434 PATENT WERE AGAINST THE WEIGHT OF THE EVIDENCE

As discussed above, there was no evidence presented at trial that any of the prior art upon which the jury based its obviousness verdicts, alone or in combination, described all of the elements of the asserted claims of the Bosch patents. Moreover, Bosch's expert Dr. Dubowsky testified:

\* With respect to the '793 patent: The '793 patent lacks at least a beam (Dubowsky, T. Tr. at 1291:24–1292:1) and a spoiler (Dubowsky, T. Tr. at 1292:2–3). The '793 patent also specifically teaches away from increasing the height of a wiper blade because the wind force becomes greater as distance from the windshield increases (Dubowsky, T. Tr. at 1293:17–1294:7). Further, the '793 patent specifically teaches away from mounting a separate spoiler on the support structure (DTX 53 at 3:46–50).

* With respect to the '214 patent:  The '214 patent lacks at least a beam (Dubowsky, T. Tr. at 1296:10–19) and a spoiler (Dubowsky, T. Tr. at 1296:20–1297:1).  The '214 patent also specifically teaches away from increasing the height of the wiper blade because doing so would increase drag (Dubowsky, T. Tr. at 1297:2–20).

* With respect to the '394 and '507 patents:  Both references lack a beam (Dubowsky, T. Tr. at 1299:19–1300:5; 1300:15–24), end caps on both ends (Dubowsky, T. Tr. at 1299:17–18; Buechele, T. Tr. at 1034:11–17; 1045:17–20), and, as a result of these deficiencies, end caps that brace themselves on the wiper blade.  Moreover, both of these references are directed toward preventing the ends of one member of a pair of bracketed wiper blades from catching between the other wiper blade's superstructure and backing strip (Dubowsky, T. Tr. at 1299:2–16; DTX 73 at 1:71–2:12, 4:54–64; DTX 74 at 1:34–43, 1:64–2:2, 3:13–15, 4:14–18), and Pylon presented no evidence of why one of skill in the art would apply these references to a beam blade, which lacks a bracket structure on which a wiper blade could become caught.

And, as noted in sections II and III above, all of this prior art was either literally considered by the Patent Office (the '793 and '214 patents) or was cumulative to other prior art that was considered by the Patent Office (the '394 and '507 patents).

Moreover, all of this cited prior art was long known by the time the Bosch inventions were made and Bosch's patent applications filed (*see* DTX 73, issued in 1963, DTX 74, issued in 1964, DTX 52, issued in 1975, and DTX 51, issued in 1975).

In addition, there was uncontested, objective evidence presented at trial that shows the non-obviousness of the Bosch inventions.  This evidence must be considered when conducting an obviousness analysis.  *See, e.g., Sud-Chemie, Inc. v. Multisorb Techs., Inc.,* 554 F.3d 1001, 1009 (Fed. Cir. 2009).

First, it was uncontested that the Bosch Aerotwin, ICON, and Evolution wiper blades embodied the claims of the '974 patent,[24] and that Bosch's ICON and Evolution blades embodied claim 1 of the '434 patent.[25] It was also uncontested that the Bosch products had enjoyed substantial commercial success, both in terms of industry reception and demand,[26] and in overall sales figures.[27] It was similarly uncontested in the trial evidence that Pylon's Generation 1, 2, and 3 blades embody the asserted claims of the '974 patent (*see* D.I. 271, granting summary judgment of infringement) and have been commercially successful.[28] *See, e.g., Callaway Golf Co. v. Acushnet Co.*, 585 F. Supp. 2d 600, 612–13 (D. Del. 2008), *aff'd in relevant part* 576 F.3d 1331 (Fed. Cir. 2009) (finding commercial success of infringing device as evidence of non-obviousness). Pylon's witnesses described the features of the '974 patent as a "selling feature."[29] Bosch also introduced testimony that, when faced with a choice between a beam blade with no spoiler and no endcaps or waiting a year for Bosch to launch its ICON blade (which included endcaps and a spoiler), customers actually chose to wait until ICON became available.[30] Bosch's uncontested evidence therefore established both commercial success and nexus to both the '434 and '974 patents. *See, e.g., Crocs*, 598 F.3d at 1310–11 (reversing a finding of obviousness for lack of substantial evidence and noting that a "prima facie case of nexus is made when the patentee shows both that there is commercial success, and that the product that is commercially successful is the invention disclosed and claimed in the patent").

---

[24]   Kashnowski, T. Tr. at 252:17–253:22; Merkel, 353:22–354:1, 522:12–15.
[25]   Dubowsky, T. Tr. at 729:21–730:4.
[26]   Kashnowski, T. Tr. at 247:8–20; 249:9–24; 252:3–16.
[27]   Kashnowski, T. Tr. at 257:16–22.
[28]   Walker, T. Tr. at 854:12–855:3; Buechele, T. Tr. at 1127:15–17. Moreover, the jury found that claims 1 and 13 of the '434 patent were embodied in Generations 1, 2 and 3 of Pylon's wiper blades and that claims 1, 5, 7 and 13 of the '434 patent were embodied in Generations 2 and 3.
[29]   Walker, T. Tr. at 854:12–855:3.
[30]   Kashnowski, T. Tr. at 249:25–251:7.

Second, it was also uncontested that Bosch's ICON and Aerotwin blades had received substantial industry praise, including several recognized industry awards. The Aerotwin received the Pace award for innovation, the only wiper product to ever be so honored.[31] That award specifically recognized the innovative use of a spoiler on the Aerotwin beam blade.[32] The Aerotwin also received the Automechanica award, [33] and the ICON blade received the Frost and Sullivan award for innovation.[34] Pylon offered no rebuttal to this evidence. "Praise in the industry that specifically related to features of the patented invention, linking that industry praise with the patented invention," also demonstrates the unobviousness of the invention. *Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1352 (Fed. Cir. 2010).

Third, it was also uncontested that the industry had a long-felt need that was satisfied by the invention of the '974 patent. As explained at trial, the need for a beam blade was known in the art since at least 1965, when the failed Appel beam-blade patent (DTX 42) was issued. A recognized need existed in the industry for a useful beam blade that would avoid being clogged with snow and ice in inclement weather, as bracketed blades did.[35] However, as Bosch's witnesses testified, the Bosch Aerotwin blade was the first beam blade to appear in the market.[36] Beam blades, like Bosch's Aerotwin, ICON and Evolution, as well as Pylon's beam blades, satisfied this need by doing away with the bracketed superstructure (Kashnowski, T. Tr. at 271:4–22). Pylon offered no rebuttal to this evidence. Bosch's evidence of a long-felt need, met by the embodiment of the claims of the '974 patent, is further evidence of non-obviousness. *See, e.g., Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1325 (Fed. Cir. 1999).

---

[31]    Kashnowski, T. Tr. at 237:8–238:6.
[32]    Kashnowski, T. Tr. at 239:6–12.
[33]    Kashnowski, T. Tr. at 237:8–238:6; 239:6–16.
[34]    Kashnowski, T. Tr. at 259:11–18.
[35]    Kashnowski, T. Tr. at 271:4–22.
[36]    Kashnowski, T. Tr. at 233:10–25; Merkel, T. Tr. at 337:3–11.

Bosch's extensive and unrebutted evidence of secondary considerations weighs strongly in favor of non-obviousness, especially when, as here, there is no evidentiary support of motivation to combine the selected references and there is no support that the combination makes all elements of the claims of the '974 and '434 patents obvious. Given the admission by Pylon's expert that a combination of the '214 and '793 patents would be nonfunctional (*see* Buechele, T. Tr. at 1113:15–17 ('793 patent's "spoiler" is rigid); 1110:24–1111:3 (placing a rigid spoiler on a beam blade would result in an inoperable beam blade)), that both references explicitly teach away from increasing the height of a wiper blade by adding a separate component, and given the complete lack of any evidence of motivation to combine, there is no clear and convincing evidence of obviousness in the record, and the jury's verdict as to the '974 patent is against the clear weight of the evidence, especially when considered in light of the unrebutted objective evidence of non-obviousness. Similarly, given the admission by Pylon's expert that the '394 and '507 patents lack the beam element of the '434 patent, and the complete lack of motivation to combine these two references, there is no clear and convincing evidence in the record and the jury's verdict as to claims 1 and 5 of the '434 patent is against the clear weight of the evidence. Bosch therefore respectfully requests judgment as a matter of law (or, in the alternative, a new trial) on the issue of obviousness of claims 1 and 8 of the '974 patent and 1 and 5 of the '434 patent.

V.    IN VIEW OF THE VERDICT OF INFRINGEMENT OF CLAIM 5 OF THE '434
      PATENT, A VERDICT OF INFRINGEMENT OF DEPENDENT CLAIM 7 WAS
      COMPELLED BY THE COURT'S CLAIM CONSTRUCTION AND THE
      UNCONTESTED EVIDENCE

| Accused Product | Claim 1 | | Claim 5 | | Claim 7 | | Claim 13 | |
|---|---|---|---|---|---|---|---|---|
| | Yes | No | Yes | No | Yes | No | Yes | No |
| Generation 1 | ✓ | | | | | | ✓ | |
| Generation 2 | ✓ | | ✓ | | | ✓ | ✓ | |
| Generation 3 | ✓ | | ✓ | | | ✓ | ✓ | |

Asserted claim 7 of the '434 patent depends from claim 5, which the jury found to be infringed by Pylon's Generation 2 and Generation 3 products.  Claim 7 describes only that "the detent shoulder (132) is embodied on a detent tooth (130) that protrudes from the long side of the support element" (PTX6 at 7:27–29).  The Court construed "detent tooth that protrudes from the long side of the support element" to mean "a protrusion, one surface of which defines a detent shoulder" (D.I. 270 at 7).  The "long sides" of the support element were construed as the "longitudinal sides of the support element" (D.I. 270 at 6–7).

The detent teeth of Pylon's products are shown in the figures below, taken from Plaintiff's Demonstrative 1023.  During the trial, Dr. Dubowsky explained that those teeth are located on the longitudinal sides of the support elements (Dubowsky, T. Tr. at 728:13–729:10).





**Pylon's Generation 2 support element**        **Pylon's Generation 3 support element**

Pylon's defense at trial was that Pylon's blades did not infringe this claim because the "long side" referred only to the outermost edge of the left and right sides (Buechele, T. Tr. at 993:24–994:11). This argument was raised by Pylon during claim construction and dismissed by the Court (D.I. 167 at 20–21; D.I. 270 at 6–7).

Because Bosch presented evidence of infringement under the Court's claim construction, and because Pylon's only non-infringement testimony was based on a rejected claim construction, the Court should enter judgment of infringement as a matter of law, or in the alternative order a new trial of the infringement issue. *LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*, 275 F.3d 1347, 1356–57 (Fed. Cir. 2002) (affirming JMOL of infringement where no evidence was before the jury to rebut the substantial evidence of infringement); *Intel Corp. v. Broadcom Corp.*, C.A. No. 00-796-SLR, 2003 WL 360256 (D. Del. Feb. 13, 2003).

## VI.   PYLON'S IMPROPER EXPERT TESTIMONY AND CLOSING ARGUMENT MERIT THE GRANT OF A NEW TRIAL ON THE ISSUES DISCUSSED ABOVE

During the trial, Pylon (i) presented expert testimony that was not disclosed in its expert's reports, (ii) presented previously undisclosed fact testimony from its technical expert, and (iii) made an improper closing argument, including falsely arguing to the jury that Pylon did not infringe the '974 patent that the Court had already ruled infringed on summary judgment. Moreover, Pylon obtained an independent-invention jury instruction that was not supported by its contentions and evidence. For all these reasons, the Court should grant a new trial—at Pylon's expense, at least if the Court's decision is based in part on the expert testimony Pylon presented beyond the scope of its reports—on any of the issues discussed in the sections above for which the Court does not grant judgment as a matter of law in favor of Bosch.

## A.    Pylon's Expert Testimony Was Not Disclosed In Its Expert's Reports

When testifying regarding the validity of the Bosch patents, Mr. Buechele presented a number of opinions not previously disclosed in his reports, opinions which infected the jury's understanding of the scope and content of the prior art and of motivation to combine bracketed blade art with beam blade art. Bosch objected to the admission of such testimony (*see, e.g.*, T. Tr. at 990:45, granting Bosch a standing objection to Mr. Buechele's unsupported testimony). While the Court allowed Pylon to proceed, it instructed the parties that if the objection to the unsupported expert opinions "becomes critical in post-trial and I determine that there was no support, then the party who proffered that opinion gets to pay for a new trial" (T. Tr. at 649:18–650:2; *see also* the Court's Guidelines for Civil Trials at 3). Because Pylon's expert's trial testimony with respect to validity of the '974 and the '434 patents falls outside the scope of Mr. Buechele's reports and is critical to the jury's verdict, Bosch respectfully requests that the Court vacate the jury's verdicts in favor of Pylon on validity of the Bosch '974 and '434 patents and charge Pylon with the cost of a new trial.

In connection with the validity of the Bosch '974 patent, Mr. Buechele opined that wind lift is a problem for the beam-type wiper blade disclosed in the Swanepoel patent (Buechele, T. Tr. at 1017:12–15). Mr. Buechele also testified that a beam blade is considered to be a low-profile wiper blade, which provides a motivation to combine the Swanepoel beam blade with the teachings of the '793 patent (*see* Buechele, T. Tr. at 1020:16–1021:2). The jury rejected Pylon's invalidity theories based on the Swanepoel patent, but critically, may have applied Mr. Buechele's testimony to the prior art on which the jury did rely.

Mr. Buechele also testified about the teaching of Figure 1 of the '214 patent, which he did not address in his report (Buechele, T. Tr. at 1028:3–17). This testimony is critical because it

is the only opinion concerning how the '214 patent relates to claim 8 of the '974 patent, which requires that the "leading-edge face extends at least nearly over an entire length of the wiper blade."

A number of Mr. Buechele's opinions with regard to obviousness of the Bosch '434 patent were not included in his reports.  Specifically, Mr. Buechele for the first time at trial opined that although the '507 patent only discloses an end cap on one end of the wiper blade, it would have been a mere design choice to mount an end cap at each end of the support element (*see* Buechele T. Tr. at 1034:11–23).  Mr. Buechele's opinion that it would be a design choice to provide at least one detent shoulder on each of the two end sections of the "support element" of the '507 patent is equally unsupported in his reports (*see* Buechele, T. Tr. at 1036:11–18).

Similarly, with regard to the '394 patent, Mr. Buechele testified at trial that, although the '394 patent only discloses a fender on one end of the wiper blade, it would have been a design choice to mount it at each end, as claim 1 of the '434 patent requires (Buechele, T. Tr. at 1045:13–1046:6).  Again, this opinion is not in his expert reports.  Mr. Buechele also testified at trial regarding the teachings of Figure 8, which illustrate how the detent shoulder of the fender interacts with the counterpart shoulder on the support superstructure, which he does not discuss in his reports (Buechele, T. Tr. at 1047:20–1049:13).

Mr. Buechele's opinions regarding the '507 and the '394 patents are critical to the jury's verdict, because the jury relied only on these two patents in rendering claims 1 and 5 of the Bosch '434 patent obvious.

**B.     Pylon's Expert's Fact Testimony Was Not Disclosed, In Reports Or In Any Other Form**

During direct examination, Pylon elicited testimony from its expert, Mr. Buechele, that he himself had designed a beam blade with a spoiler (Buechele, T. Tr. at 968:8–969:11).  Bosch

objected, and the Court indicated that it would follow its standard procedure, wherein unsupported expert statements are evaluated post-trial and, if critical, justify a new trial at the proffering party's expense (Buechele, T. Tr. at 969:14–19). Mr. Buechele's statements were likely relied on by the jury in returning its verdict of obviousness of claims 1 and 8 of the '974 patent.[37] They were not included in any of his expert reports, or in any of Pylon's discovery responses.[38]

Moreover, on cross examination, Mr. Buechele's testimony indicated that Pylon had concealed documents produced to it by Mr. Buechele in connection with this undisclosed testimony about his alleged prior work (Buechele, T. Tr. at 1112:9–12). Pylon's discovery misconduct unfairly prejudiced Bosch when Pylon surprised Bosch with Mr. Buechele's unsupported testimony in front of the jury. Bosch therefore requests a new trial on the issue of obviousness of claims 1 and 8 of the '974 patent, at Pylon's expense.

### C.   Pylon's Counsel Made An Improper Closing Argument

A new trial should be granted if it is "reasonably probable" that improper statements during closing influenced the verdict. *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 207 (3d Cir. 1992). A party is "not required to object to each and every objectionable remark" during closing. *Id.* at 207 n.26.

---

[37]    Pylon successfully requested a jury instruction on independent invention (T. Tr. at 1558:24–1559:7), over Bosch's objection (T. Tr. at 1423:8–10). However, before Mr. Buechele's testimony, Pylon had never argued that evidence of independent invention weighs in favor of a finding of obviousness, nor did Pylon raise this contention during discovery in response to Bosch's interrogatories. There was no proper basis for this instruction, and Bosch therefore requests that the Court order a new trial on the issue of validity of the '974 patent.

[38]    This testimony also contradicts Mr. Buechele's deposition testimony, wherein he stated that his sole contribution to Trico's beam blade project was to design the rubber extrusion process.

First, during his closing, Pylon's counsel repeatedly referred to the "absence" of Mr. Leutsch and Mr. Kotlarski, two named inventors of the '974 patent, as well as Trico (T. Tr. at 1484:6–17; 1488:14–22; 1505:21–1506:4). This violated the stipulated pretrial order, which stated that "a party's failure to call a witness identified on the witness list shall not be commented on during trial" (D.I. 262 at ¶255).[39]  Bosch requested and received a curative instruction on this issue, but, given the jury's verdict, it appears that the instruction did not cure the harm.

Second, Pylon's counsel falsely argued to the jury and ignored the Court's order to not refer to infringement of the '974 patent when he stated, "What I'm going to show you is that we don't infringe claim 1. And in the '974, because we don't infringe claim 1, we don't infringe claim 8" (T. Tr. at 1475:6–8). The Court specifically limited what both parties could say regarding infringement of the '974 patent (T. Tr. at 135:3–5 ("this is what you can say: That the issue of infringement of the '974 patent has been determined by the Court.")). And as noted above, the Court had in fact already ruled that Pylon infringed the '974 patent—Pylon's counsel's argument was literally and completely false.

Third, Pylon's counsel impermissibly referred to Bosch as seeking a "monopoly" (T. Tr. at 1470:21–23 ("But a patent, and let there be no mistake about it, is nothing other than a monopoly.")). "The characterization of a patent as a 'monopoly' is misdirected" and should be avoided. *Jamesbury Corp. v. Litton Indus. Prods., Inc.*, 756 F.2d 1556, 1559 (Fed. Cir. 1985).

---

[39]   Bosch, on the other hand, followed this order and did not comment on Pylon's failure to call its president, Charles Tornabene (who was promised to appear during Pylon's opening statement (T. Tr. at 185:1–16)), Laurence Olivier (an attendee at the September 17 meeting) or Paul Wozniak, a Trico representative, all of whom were previously deposed in this case and were listed on Pylon's witness list (*see* D.I. 262, Ex. 4).

Fourth, Pylon's counsel misstated the law when he said that, "if there is derivation on claim 1, claim 8 likewise goes because all the elements of claim 1 are in claim 8" (T. Tr. at 1479:6–8). Contrary to Pylon's counsel's argument, the law is that, for a claim to be derived, the supposed earlier inventor must have had a conception and communication of all elements of that claim. *Int'l Rectifier*, 361 F.3d at 1376–77; *Singh*, 222 F.3d at 1367 ("A conception must encompass all limitations of the claimed invention."). As noted above, Pylon in fact had presented no evidence with respect to derivation of claim 8.

Fifth, Pylon's counsel falsely accused Bosch of concealing Bosch GmbH's ownership of one of the prior art patents related to the '905 patent (T. Tr. at 1504:25–1505:5 ("Look who the inventor of this patent is. That's the infamous Thomas Kotlarski. Look who owns this patent: Robert Bosch. I guess they just forgot to tell you that. They forgot."); 1505:23–1506:4 ("you don't tell the jury that the base art, one reference of base art against which the improvement, the closing of the gaps, could be measured, is a patent that you own and was invented by somebody who we should have heard from in this case? Is that forthright disclosure? Is that -- honestly, is that an honest argument from Bosch?")). In fact, Bosch's counsel had explicitly elicited the ownership of the patent during cross-examination of Pylon's expert, Mr. Buechele (Buechele, T. Tr. at 1121:2–3). Such arguments are improper, all the more so because they are false. *See, e.g., Fineman*, 980 F.2d at 209 ("vituperative references to opposing counsel will not be tolerated").

In view of these arguments made during Pylon's closing, Bosch respectfully requests that the Court grant a new trial on derivation and obviousness. *See, e.g., Fineman*, 980 F.2d at 207–11.

## CONCLUSION

As argued in section I above, Pylon did not present evidence legally sufficient to support its derivation defense, and the Court should therefore enter judgment as a matter of law in Bosch's favor on that issue. If judgment as a matter of law is denied, then the Court should order a new trial on this issue because the jury's conclusion is against the weight of the evidence.

As argued in sections II and III above, the jury's obviousness verdicts with respect to the '974 patent and claims 1 and 5 of the '434 patent are not supported by any evidence, and the Court should therefore enter judgment as a matter of law in Bosch's favor on those issues. Moreover, as argued in section IV above, the uncontested evidence shows that Bosch's patent claims would not have been obvious to one of skill in the art at the time the inventions were made, and for that reason, too, the Court should enter judgment as a matter of law in Bosch's favor on those issues. If judgment as a matter of law is denied, then the Court should order a new trial on these obviousness issues because the jury's conclusion is against the weight of the evidence.

As argued in section V above, the jury's verdict of non-infringement of dependent claim 7 of the '434 patent could only have been reached in violation of the Court's claim construction order. In view of that order, and the uncontested evidence, the Court should enter judgment as a matter of law in Bosch's favor on that issue. If judgment as a matter of law is denied, then the Court should order a new trial on that issue because the jury's conclusion is against the weight of the evidence.

Finally, as argued in section VI above, Pylon's discovery violations, its expert's testimony beyond the scope of his reports, and Pylon's counsel's improper closing arguments all inevitably influenced the jury in reaching its conclusions against Bosch on the above-listed

issues.  If judgment as a matter of law on any of these issues is denied, then the Court should

order a new trial, at Pylon's expense, as a consequence of Pylon's improper conduct at trial.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Michael J. Lennon
Mark A. Hannemann
R. Scott Roe
Yekaterina T. Korostash
Jeffrey S. Ginsberg
Huiya Wu
KENYON & KENYON LLP
One Broadway
New York, NY  10004

Susan A. Smith
KENYON & KENYON LLP
1500 K Street, NW
Washington, DC  20005

Dated:  May 26, 2010
968132 / 33181

By:    /s/ David E. Moore
       Richard L. Horwitz (#2246)
       David E. Moore (#3983)
       Hercules Plaza, 6th Floor
       1313 N. Market Street
       Wilmington, DE  19801
       Tel:  (302) 984-6000
       rhorwitz@potteranderson.com
       dmoore@potteranderson.com

*Attorneys for Plaintiff Robert Bosch LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on May 26, 2010, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I hereby certify that on May 26, 2010, the attached document was Electronically Mailed

to the following person(s):

Ashley B. Stitzer
Stephen B. Brauerman
Bayard, P.A.
222 Delaware Avenue, Suite 900
Wilmington, DE 19899
astitzer@bayardlaw.com
sbrauerman@bayardlaw.com

James A. Gale
Jeffrey D. Feldman
Feldman Gale, P.A.
One Biscayne Tower, 30th Floor
2 S. Biscayne Blvd.
Miami, FL 33139
jgale@feldmangale.com
jfeldman@feldmangale.com

Gregory L. Hillyer
Javier Sobrado
Feldman Gale, P.A.
1420 Montgomery Lane, Suite 400
Bethesda, MD 20814
ghillyer@feldmangale.com
jsobrado@feldmangale.com

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
POTTER ANDERSON & CORROON LLP
 (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

890716 / 33181