IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ROBERT BOSCH, LLC, )
                                       )
        Plaintiff, )
                                       )
    v. ) Civ. No. 08-542-SLR
                                       )
PYLON MANUFACTURING CORP., )
                                       )
        Defendant. )

David Ellis Moore, Esquire and Richard L. Horwitz, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Michael J. Lennon, Esquire, Mark A. Hannemann, Esquire and Jeffrey S. Ginsberg, Esquire of Kenyon & Kenyon LLP, New York, New York.

Ashley Blake Stitzer, Esquire and Stephen B. Brauerman, Esquire of Bayard, P.A., Wilmington, Delaware. Counsel for Defendant. Of Counsel: Gregory L. Hillyer, Esquire of Feldman Gale, P.A., Philadelphia, Pennsylvania, Jeffrey D. Feldman, Esquire of Feldman Gale, P.A., Miami, Florida.

**OPINION**

Dated: March 9, 2011
Wilmington, Delaware

[signature] ROBINSON, District Judge

## I. INTRODUCTION

Robert Bosch, LLC ("Bosch") filed this patent infringement action against Pylon Manufacturing Corporation ("Pylon") on August 25, 2008. (D.I. 1) Both parties are manufacturers of automotive windshield wiper blades. Presently before this court is Pylon's "motion for judgment of unenforceability" of Bosch's U.S. Patent No. 6,292,974 ("the '974 patent") on the basis of inequitable conduct. (D.I. 322) Specifically, Pylon contends that the submissions made by Robert Bosch GmbH ("Bosch GmbH") employees Wilfred Merkel ("Merkel") and Wolfgang Leutsch ("Leutsch") to the United States Patent and Trademark Office ("PTO") regarding the '974 patent failed to: (1) list Johannes Fehrsen ("Fehrsen") as an inventor of the '974 patent relating to the triangular spoiler; (2) disclose Fehrsen's Inclined Beam alternative; and (3) disclose Adriaan Swanepoel's ("Swanepoel") spoiler to beam concept contained in his 1991 memorandum (the "Swanepoel memorandum"). (D.I. 362 at 6) Having conducted a bench trial on the issue of inequitable conduct and having reviewed the parties' submissions, the court denies Pylon's claim.[1]

---

[1] The court does not entertain motions for summary judgment on equitable issues, instead holding bench trials on such issues. Therefore, although Pylon styles its post-trial paper as a "motion," in reality Pylon has simply filed its post-trial brief in support of its claim of unenforceability. For the sake of the docket, Pylon's motion (D.I. 322) is denied because its claim has been denied.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Facts Relevant to Inequitable Conduct[2]

#### 1. Collaboration between Bosch GmbH and AMIC

In the early 1990s, Swanepoel, a South African engineer, developed a prototype "Variflex" bracketless, tapered wiper blade with Fehrsen on behalf of the Anglo American Industrial Corporation ("AMIC"). (D.I. 369 at 364:8-19; D.I. 370 at 544:24 - 553:17; D.I. 373 at 1234:1 - 1236:10; D.I. 376 at 1598:15 - 1599:5) Bosch GmbH, hoping to commercialize the wiper blades, provided Fehrsen and Swanepoel with specifications to address "lift-off" problems identified with the high speed quality of the Variflex wiper blades. (Id.) In connection with these efforts, Swanepoel prepared the Swanepoel memorandum in which he proposed to solve the problem by either reducing the height of the blade from the windshield or by mounting a rigid spoiler on the top surface of the beam. (DTX 265; D.I. 369 at 374:11 - 376:21; D.I. 373 at 1235:18 - 1242:15)

In September 1992, Fehrsen met with Merkel and Leutsch to discuss solutions to the wind lift problem for AMIC's beam blade. (D.I. 370 at 408:20 - 409:11, 562:24 - 564:2; D.I. 376 at 1603:6-22) The two solutions proposed at this meeting included: (1) a flexible spoiler mounted on top of the beam (the "Triangular Spoiler"); and (2) tilting the beam itself relative to the windshield (the "Inclined Beam"). (D.I. 369 at 387:22 - 388:15; D.I. 370 at 415:5 - 416:25; D.I. 376 at 1583:8-21, 1585:3-12) Pylon alleges that

---

[2]Additional background relevant to the litigation may be found at *Robert Bosch, LLC v. Pylon Mfg. Corp.*, 700 F. Supp. 2d 625 (D. Del. 2010) and *Robert Bosch, LLC v. Pylon Mfg. Corp.*, Civ. A. No. 08-542, 2010 WL 4340696 (D. Del. Nov. 3, 2010).

it was at this meeting that Fehrsen disclosed the Triangular Spoiler and Inclined Beam solutions to Merkel and Leutsch. (D.I. 370 at 564:3 - 565:5) Conversely, Bosch alleges that Merkel and Leutsch pitched the Triangular Spoiler idea, attributing only the Inclined Beam concept to Fehrsen. (D.I. 369 at 387:22 - 388:15; D.I. 376 at 1583:8-21) The only documentary evidence prior to or during the September 1992 meeting regarding these disclosures is embodied in Fehrsen's meeting notes, depicted below, which diagram both solutions but do not attribute ownership of either concept. (D.I. 370 at 487:12 - 488:6; D.I. 376 at 1600:25 - 1602:18)

  

"Triangular Spoiler"    "Inclined Beam"

(PTX 113)

AMIC and Bosch GmbH entered into a confidentiality agreement pertaining to the Variflex beam blade which obligated each party to keep confidential all technical information received from the other party and granted the party who provided the information the rights over the information. (DTX 237; D.I. 370 at 471:14 - 474:18) Moreover, any working results, improvements and inventions, whether or not they were patentable, would be jointly owned by both parties. (*Id.*) The obligation to keep technical information confidential terminated at the end of 2001, five years after the expiration of the agreement in December 1996. (*Id.*) In July 1996, without informing

AMIC, Bosch GmbH mounted a spoiler on a prototype constant thickness beam and tested it at Mercedes Benz's wind tunnel in Germany. (D.I. 370 at 575:2 - 576:23; D.I. 376 at 1637:20 - 1638:24)

The collaboration between Bosch GmbH and AMIC formally ended in October 1996. (D.I. 370 at 423:11-15, 576:24 - 577:21) AMIC subsequently sold its beam blade technology to Bosch competitor Trico Products Corporation ("Trico") in August 1998. (DTX 183; D.I. 370 at 582:8-17) Bosch GmbH made several unsuccessful attempts to purchase or license certain beam blade technology from AMIC and then, after AMIC's transfer of its intellectual property, from Trico. (D.I. 370 at 578:2 - 583:16, 615:8-20; D.I. 373 at 1255:20 - 1258:16) The license agreement sought by Bosch GmbH regarding AMIC's Variflex-related patents concerned only AMIC's lateral stiffness patent, which had a beam tapered in width and in thickness and did not concern the spoiler technology. (D.I. 370 at 428:12 - 430:3; D.I. 373 at 1222:6 - 1223:1, 1282:10-15) At one meeting held in December 1997 for purposes of discussing a potential licensing agreement, Merkel displayed a prototype of Bosch GmbH's flexible spoiler wiper design with a constant width and thickness, and neither Fehrsen nor Swanepoel claimed that the prototype included their ideas. (D.I. 370 at 430:4-18; D.I. 373 at 1255:20 - 1259:17, 1280:20-23, 1285:12-24)

After learning of Bosch GmbH's efforts to obtain patent protection on its prototype, Trico requested that Fehrsen and Swanepoel memorialize their recollection regarding the conception of the spoiler technology, as well as the particulars regarding the joint development efforts between Bosch GmbH and AMIC. (D.I. 370 at 586:1-24; D.I. 373 at 1265:25 - 1268:11) On July 12, 2001, Trico sent a letter to AMIC expressing

4

its concerns regarding the subject matter of Bosch GmbH's pending patent applications. (DTX 193; D.I. 370 at 636:7-13; D.I. 373 at 1268:12-22) In September of 2001, Bosch GmbH received a claim that AMIC personnel had contributed to the flexible spoiler invention and that Bosch GmbH had breached its contract with AMIC by filing the '974 patent. (DTX 194; D.I. 370 at 636:7 - 638:20; D.I. 376 at 1743:17 - 1744:9) In response, Bosch GmbH denied the allegations, detailed its inventorship positions and noted that Fehrsen was appropriately identified on an invention disclosure for his Inclined Beam contribution. (DTX 199; D.I. 376 at 1753:18 - 1754:13) AMIC thereafter dropped the correspondence and did not file a lawsuit against Bosch GmbH. (D.I. 370 at 589:7-10, 622:2 - 623:9; D.I. 376 at 1754:2-13)

### 2. Prosecution history of the '974 patent

In 1995, Thomas Kotlarski ("Kotlarski") began to work on the beam blade project in the wiper blade division of Bosch. (D.I. 376 at 1705:24 - 1706:10) In early 1996, Kotlarski prepared an invention disclosure form for the ideas that were later embodied in the '974 patent, listing himself, Merkel, Leutsch and Friedrich Don as the inventors after discussing the invention disclosure form with Merkel. (D.I. 376 at 1651:11 - 1652:11, 1708:16 - 1709:12) Kotlarski did not list Fehrsen as an inventor on the invention disclosure form regarding the '974 patent because Merkel indicated that Fehrsen had not proposed the use of a spoiler on a beam blade, which originated with Bosch GmbH employees. (D.I. 376 at 1651:8 - 1653:17, 1654:7-17, 1708:25 - 1709:16) However, Kotlarski listed Fehrsen as an inventor on the final version of the invention disclosure form describing the Inclined Beam concept because Merkel informed him that Fehrsen had suggested the idea years before. (D.I. 376 at 1709:17-23, 1720:22 -

5

1721:7, 1731:9 - 1732:12)

In August 1997, Bosch GmbH's patent department filed a German patent application based on the Kotlarski flexible spoiler invention disclosure form, but no application was filed on the Inclined Beam invention. (D.I. 370 at 348:25 - 349:7; D.I. 376 at 1640:13-16, 1653:3-17, 1654:4-6, 1747:21 - 1748:6) In July 1998, Bosch filed a PCT application, identified as patent application serial number 09/284,398 ("the '398 application"), which was based on the German patent application. (PTX 3 at BOS_LLC0798994-0799008; D.I. 376 at 1587:16-24, 1664:18 - 1665:8) Claim 1 of the '398 application reads:

> A wiper blade (10) for windows (25) of motor vehicles, having an elongated, rubber-elastic wiper strip (14) which can be applied to the window to be wiped and is disposed substantially longitudinally axially parallel to one face (34), that is, the face oriented toward the window, of a striplike, spring-elastic support element (12), which is connected to a wiper arm (18) that is driven crosswise to the length of the wiper blade and can be urged toward the window, characterized in that the wiper blade (10) is provided with a leading-edge face (36 or 60), which extends longitudinally of the wiper blade and substantially parallel to the window (25) and faces into the wind (46), and which crosswise to its length forms an acute angle (α) with the window.

(PTX 3) The '398 application led to the '974 patent. Issued claim 1 of the '974 patent reads as follows:

> A wiper blade for windows of motor vehicles, comprising a curved, bandshaped, spring-elastic support element which distributes a pressure applied by a wiper arm and has a concave and a convex surface which defines corresponding planes; an elongated rubber-elastic wiper strip placeable on a window to be wiped and mounted to said concave surface of said support element which faces the window, substantially longitudinally parallel to said concave surface; a connection device provided for a wiper arm and arranged directly on a convex side of said support element; and a component which is separate from said wiper strip and is mounted directly to the convex surface of said support element so as to form a leading-edge face extending in a longitudinal direction of the

6

support element and forming, as seen crosswise to its longitudinal
extension, an acute angle with a plane which extends parallel to a plane
formed by said convex surface.

(PTX 1 at col. 4:16-32) In March 1999, Merkel and Leutsch signed an inventor oath stating that they believed themselves, Kotlarski and Friedrich Don to be the inventors of the inventions described in the application. (DTX 404; D.I. 376 at 1591:2-22, 1661:13 - 1662:22, 1712:10-20)

### 3. Jury verdict

A jury trial was held between April 15 and April 23, 2010. On April 23, 2010, the jury found that claims 1 and 8 of the '974 patent were invalid on two grounds: (1) obviousness in view of the prior art; and (2) derivation from Johannes Fehrsen ("Fehrsen"). (D.I. 299 at 1-2) The parties filed various motions for judgment as a matter of law on May 26, 2010, including the instant motion for judgment as a matter of law of unenforceability of the '974 patent on the basis of inequitable conduct. (D.I. 322) On November 3, 2010, the court issued an order upholding the jury's verdict with respect to derivation of claim 1 of the '974 patent. (D.I. 361) A bench trial on the issue of inequitable conduct was held before the court on September 17, 2010.

### B. Legal Standard

Applicants for patents and their legal representatives have a duty of candor, good faith, and honesty in their dealings with the United State Patent and Trademark Office ("PTO"). *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995); 37 C.F.R. § 1.56(a) (2003). The duty of candor, good faith and honesty includes the duty to submit truthful information and the duty to disclose to the PTO information known to

the patent applicants or their attorneys which is material to the examination of the patent application. *Elk Corp. of Dallas v. GAF Bldg. Materials Corp.*, 168 F.3d 28, 30 (Fed. Cir. 1999). A breach of this duty constititues inquitable conduct. *Molins*, 48 F.3d at 1178. If it is established that a patent applicant engaged in inequitable conduct, then the patent application is rendered unenforceable. *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 877 (Fed. Cir. 1988).

To establish unenforceability based on inequitable conduct, a defendant must establish, by clear and convincing evidence, that: (1) the omitted or false information was material to patentability of the invention; or (2) the applicant had knowledge of the existence and materiality of the information; and (3) the applicant intended to deceive the PTO. *Molins*, 48 F.3d at 1178. A determination of inequitable conduct, therefore, entails a two step analysis. First, the court must determine whether the withheld information meets a threshold level of materiality. A reference is considered material if there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. *Allied Colloids, Inc. v. American Cyanamid Co.*, 64 F.3d 1570, 1578 (Fed. Cir. 1995) (citations omitted). A reference, however, does not have to render the claimed invention unpatentable or invalid to be material. *See Merck & Co., Inc. v. Danbury Pharmacal*, 873 F.2d 1418, 1421 (Fed. Cir. 1989).

After determining that the applicant withheld material information, the court must then decide whether the applicant acted with the requisite level of intent to mislead the PTO. *See Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 (Fed. Cir.

2009); *Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1329 (Fed. Cir. 1998). "Intent to deceive cannot be inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent." *Herbert v. Lisle Corp.*, 99 F.3d 1109, 1116 (Fed. Cir. 1996). That is, "the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Kingsdown*, 863 F.2d at 876. Evidence of specific intent must "be clear and convincing, and inferences drawn from lesser evidence cannot satisfy the deceptive intent requirement." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008). A "smoking gun," however, is not required in order to establish an intent to deceive. *See Merck*, 873 F.2d at 1422.

Once materiality and intent to deceive have been established by clear and convincing evidence, the trial court must weigh them to determine whether the balance tips in favor of a conclusion of inequitable conduct. *N.V. Akzo v. E.I. DuPont de Nemours*, 810 F.2d 1148, 1153 (Fed. Cir. 1987). The showing of intent can be proportionally less when balanced against high materiality. *Id.* In contrast, the showing of intent must be proportionally greater when balanced against low materiality. *Id.*

### C. Discussion

#### 1. Inventorship of claim 1 of the '974 patent

The court concludes that Merkel and Leutsch committed a material omission by presenting Fehrsen's ideas as their own during the prosecution of the '974 patent, but Pylon failed to present sufficient evidence of Merkel and Leutsch's intent to deceive to

9

establish inequitable conduct by clear and convincing evidence. A failure to disclose the true inventorship of a patent is a material omission. *See Bd. of Educ. ex rel. Fla. State Univ. v. Am. Bioscience, Inc.*, 333 F.3d 1330, 1344 (Fed. Cir. 2003) (failure to name "only true inventors" in a patent application may result in a finding of inequitable conduct). Thus, the jury's finding that claim 1 of the '974 patent was derived from Fehrsen establishes that Merkel and Leutsch's omission of Fehrsen as an inventor of the '974 patent was material.

Pylon's showing of intent may be proportionally less as a result of the high materiality of the jury's finding on inventorship. *See Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1234 (Fed. Cir. 2003). However, Pylon must separately establish Merkel and Leutsch's intent to deceive by clear and convincing evidence before the court will weigh the balance of materiality and intent to deceive. *Star Scientific*, 537 F.3d at 1367 ("If a threshold level of intent to deceive or materiality is not established by clear and convincing evidence, the district court does not have any discretion to exercise and cannot hold the patent unenforceable regardless of the relative equities or how it might balance them"). In this regard, instead of producing evidence that separately shows Merkel and Leutsch's intent to deceive, Pylon points to Merkel and Leutsch's failure to disclose Fehrsen's role in inventing the '974 patent. *See Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1381 (Fed. Cir. 2006) (holding that an inventor's declaration omitting a putative inventor is not evidence of intent); *see also Cancer Research Tech. Ltd. v. Barr Labs., Inc.*, 625 F.3d 724, 733-34 (Fed. Cir. 2010) (holding that "materiality and intent are separate requirements, and intent to

deceive cannot be found based on materiality alone"). Pylon's focus on Merkel and Leutsch's execution of the sworn declarations is a distinction without a difference because Pylon failed to produce clear and convincing evidence that Merkel and Leutsch knew that Fehrsen was the true inventor at the time they executed the declarations.

Moreover, evidence of Merkel and Leutsch's intent to deceive cannot be inferred from the circumstances of this case. "An inference of intent to deceive is generally appropriate . . . when (1) highly material information is withheld; (2) the applicant knew of the information [and] . . . knew or should have known of the materiality of the information; and (3) the applicant has not provided a credible explanation for the withholding." *Praxair, Inc. v. ATMI, Inc.* 543 F.3d 1306, 1313-14 (Fed. Cir. 2008) (internal quotations and citations omitted). The inference must be the single most reasonable inference that can be drawn from the evidence. *See Star Scientific*, 357 F.3d at 1366.

In this case, a substantial lapse of time took place between the September 1992 meeting and Merkel and Leutsch's preparation of the invention disclosure form in 1996, lending credibility to Merkel and Leutsch's contention that they believed they had originated the Triangular Spoiler concept. The evidence also demonstrates that several ideas were raised at the September 1992 meeting but none were formally recorded and attributed to particular individuals, supporting an inference that Merkel and Leutsch honestly believed that they invented claim 1 of the '974 patent. Moreover, Bosch's alleged violation of the confidentiality agreement by showing Mercedes a prototype of the Triangular Spoiler concept does not provide clear and convincing evidence of

Merkel and Leutsch's intent to deceive when Merkel and Leutsch's testimony reasonably suggests that they honestly believed the Triangular Spoiler idea to be their own. The court concludes that Merkel and Leutsch's failure to disclose the Inclined Beam concept and the Swanepoel memorandum likewise does not demonstrate their intent to deceive by clear and convincing evidence. As discussed in more depth in the subsequent subsections, a reasonable inference can be made that Merkel and Leutsch did not believe the Inclined Beam concept or the Swanepoel memorandum were relevant to the submissions leading up to the '974 patent.

AMIC's actions did little to correct Merkel and Leutsch's erroneous belief that they originated claim 1 of the '974 patent when AMIC never sought patent protection over the flexible spoiler concept, and neither Fehrsen nor Swanepoel claimed inventorship of Merkel's prototype shown at the December 1997 meeting. Although AMIC and Trico accused Bosch GmbH of misappropriating their technology, the evidence of record indicates that they dropped all correspondence and did not file a lawsuit following Bosch GmbH's response denying their allegations. Moreover, Bosch GmbH's failed attempts to license technology from AMIC and Trico are irrelevant because testimony from both sides indicates that the licenses were sought on a lateral stiffness beam and were not related to the Inclined Beam or Triangular Spoiler concepts. Thus, the court concludes that Pylon's version of events is not the single most reasonable inference to be drawn from the evidence and, as a result, Pylon has failed to prove Merkel and Leutsch's intent to deceive by clear and convincing evidence.

### 2. Fehrsen's Inclined Beam concept

The court concludes that Merkel and Leutsch's failure to disclose the Inclined Beam concept to the PTO during the prosecution of the '974 patent was not a material omission. Specifically, the '974 patent is directed to a flexible spoiler mounted to the top of the beam as a separate component from the wiper strip, a concept which is not supported by the Inclined Beam concept. Pylon failed to present clear and convincing evidence that the Inclined Beam concept was material to the prosecution of the '974 patent.

The court further concludes that Merkel and Leutsch did not intend to deceive the PTO by omitting the Inclined Beam concept from their submissions. The record indicates that a separate invention disclosure form was completed for the Inclined Beam concept, indicating that Merkel and Leutsch believed the Inclined Beam concept to be a separately patentable idea not relevant to the spoiler concept contained in the '974 patent. Moreover, by informing Kotlarski that Fehrsen had contributed to the concept and should be credited on the invention disclosure form, Merkel demonstrated that he did not intend to misappropriate Fehrsen's idea for his own use. Thus, Pylon has failed to meet its burden of proving, by clear and convincing evidence, Merkel and Leutsch's intent to deceive with respect to Fehrsen's Inclined Beam concept.

### 3. Swanepoel's spoiler to beam concept

The court concludes that Merkel and Leutsch's failure to disclose the Swanepoel memorandum to the PTO during the prosecution of the '974 patent was a material omission. "[Materiality] is judged based upon the overall degree of similarity between

the omitted reference and the claimed invention in light of the other prior art before the examiner." *Baxter*, 149 F.3d at 1328. Prior to the prosecution of the '974 patent, the Swanepoel memorandum taught the concept of mounting a spoiler to the top surface of a beam blade. Although the rigid spoiler disclosed in the Swanepoel memorandum was substantially modified to achieve the flexible spoiler disclosed in the '974 patent, a reasonable examiner likely would have considered the origin of the concept of mounting a spoiler onto a beam blade in deciding whether to allow the '974 patent.

However, Pylon has failed to establish the requisite intent to deceive by Merkel and Leutsch in their failure to disclose the Swanepoel memorandum. "It is not inequitable conduct to omit telling the patent examiner information that the applicant in good faith believes is not material to patentability." *Allied Colloids*, 64 F.3d at 1578. The evidence of record indicates that Merkel and Leutsch believed their invention was substantially different from the rigid spoiler proposed by Swanepoel and, therefore, they believed that the Swanepoel memorandum had no relevance to the prosecution of the '974 patent. Pylon failed to present clear and convincing evidence that Merkel and Leutsch's omission was made with the intent to deceive the PTO, instead repeating the evidence it cited in support of the materiality of the Swanepoel memorandum and reiterating the fact that Merkel and Leutsch signed sworn declarations indicating that the '974 patent submissions were complete. Thus, Pylon's claim for inequitable conduct based on Merkel and Leutsch's failure to disclose the Swanepoel memorandum must fail.

III. CONCLUSION

For the foregoing reasons, the court denies Pylon's claim of unenforceability of the '974 patent on the basis of inequitable conduct. An appropriate order shall issue.